William J. Robinson (CA Bar No. 83729)
email: wrobinson@foley.com
Jean-Paul Ciardullo (CA Bar No. 284170)
email: jciardullo@foley.com
**FOLEY & LARDNER LLP**
555 South Flower Street, Suite 3500
Los Angeles, CA 90071-2411
Telephone: 213.972.4500
Facsimile: 213.486.0065

Attorneys for Plaintiffs
JETPACK ENTERPRISES, LLC and
JETPACK ENTERPRISES – SAN DIEGO, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| JETPACK ENTERPRISES, LLC, a California Company, and JETPACK ENTERPRISES – SAN DIEGO, LLC., a California Company, <br><br> *Plaintiffs*, <br><br> v. <br><br> JETLEV, LLC, a Delaware Company, JETLEV TECHNOLOGIES, Inc., a Florida Company, JLIP, LLC, a Delaware Company, AQUAFLIER, LLC, a Florida Company, JLSG, LLC, a New Jersey Company, SETH GERSZBERG, an Individual, and MATTHEW ROSENBLATT, an Individual, <br><br> *Defendants*. | Case No: <br><br> **COMPLAINT FOR** <br> **(I) BREACH OF CONTRACT** <br> **(II) FRAUD** <br> **(III) PROMISSORY FRAUD** <br> **(IV) NEGLIGENT MISREPRESENTATION** <br> **(V) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** <br> **(VI) CONVERSION** <br> **(VII) NEGLIGENCE** <br> **(VIII) FRAUDULENT CONVEYANCE** <br> **(IX) BREACH OF FIDUCIARY DUTY** <br><br> ***DEMAND FOR JURY TRIAL*** |

**COMPLAINT**

Plaintiffs Jetpack Enterprises, LLC ("Jetpack Enterprises") and Jetpack Enterprises – San Diego, LLC ("Jetpack Enterprises – San Diego"), by and through their attorneys, bring this Complaint in diversity against Defendants Jetlev, LLC; Jetlev Technologies, Inc.; JLIP, LLC; Aquaflier, LLC; JLSG, LLC; Seth Gerszberg and Matt Rosenblatt for breach of contract, fraud, promissory fraud, negligent misrepresentation, intentional interference with prospective economic advantage, conversion, negligence, fraudulent conveyance, and breach of fiduciary duty.

## JURISDICTION AND VENUE

1.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the Plaintiffs and Defendants are citizens of different States and because the amount in controversy exceeds $75,000.

2.     This Court has *in personam* jurisdiction over Defendants because Defendants purposefully directed the activities complained of hereunder at Plaintiffs in California; because Defendants purposefully availed themselves of the benefits of doing business with Plaintiffs in California with respect the subject matter at issue; because the contract terms at issue were negotiated in the State of California; because Defendants' obligations were to be performed in California; and because the harms inflicted by Defendants were felt by Plaintiffs in California.   The facts supporting personal jurisdiction are laid out in further detail below and are expressly incorporated here.

3.     Venue is proper under 28 U.S.C. §1391(b)(2) and (c)(2) in the Central District of California because a substantial part of the events or omissions giving rise to the claim occurred within this District, where Jetpack Enterprises' Newport Beach central place of business operations is located.   Venue is also proper under 28 U.S.C. §1391(b)(3) because defendants are subject to the court's personal jurisdiction in this District, as discussed above.

## PARTIES

4.     Jetpack Enterprises is a California limited liability company having its principal place of business at 2600 Newport Blvd., Suite 122, Newport Beach, California

1

92663.

5.     Jetpack Enterprises – San Diego is a California limited liability company having its principle place of business at 1010 Santa Clara Place, San Diego, CA 92109.

6.     Upon information and belief, Plaintiffs allege that Defendant Jetlev, LLC is a Delaware limited liability company having its principal place of business at 1105 Old Griffin Road, Dania Beach, Florida 33004.

7.     Upon information and belief, Plaintiffs allege that Defendant Jetlev Technologies, Inc. is a Florida corporation having its principal place of business at 1105 Old Griffin Road, Dania Beach, Florida 33004.

8.     Upon information and belief, Plaintiffs allege that Defendant JLIP, LLC is a Delaware limited liability company having its principal place of business at 1105 Old Griffin Road, Dania Beach, Florida 33004.

9.     Upon information and belief, Plaintiffs allege that Defendant Aquaflier, LLC is a Florida limited liability company having its principal place of business at 21200 Point Place, Suite 2903, Aventura, FL 33180.

10.     Upon information and belief, Plaintiffs allege that Defendant JLSG, LLC is a New Jersey limited liability company having its principal place of business at 811 Church Road #105, Cherry Hill, New Jersey 08002.

11.     Upon information and belief, Plaintiffs allege that Defendant Seth Gerszberg is an individual residing in the State of New York and having an address at 501 Tenth Avenue, Floor 7, New York, NY 10018.

12.     Upon information and belief, Plaintiffs allege that Defendant Matt Rosenblatt is an individual residing in the State of Florida and having an address at 21200 Point Place, Suite 2903, Aventura, FL 33180.

## FACTUAL ALLEGATIONS PART I: BACKGROUND

### Plaintiffs' Businesses

13.     Plaintiffs are engaged in the business of renting and selling recreational water jetpack equipment under the trade name "Jetpack America."  Water jetpacks allow

2

users to "fly" over a body of water by employing a floating pump to force water up a hose to an apparatus worn by the user that expels the water at high velocity, generating lift.  Water jetpacks have become increasingly popular in recent years as an alternative to other personal watercraft such as Jet Skis and WaveRunners.  Jetpack Enterprises has a jetpack rental operation in Newport Beach, and Jetpack Enterprises – San Diego has a similar operation in San Diego.  Jetpack Enterprises is also engaged in the sale of jetpacks and jetpack equipment.  Jetpack Enterprises – San Diego is a corporate affiliate of Jetpack Enterprises and has the same principal executive officer (Dean O'Malley) who is based out of Jetpack Enterprises' offices in Newport Beach, California.  Jetpack Enterprises – San Diego is an intended third party beneficiary of many of the contracts entered into by Jetpack Enterprises including some of those discussed here.

### Jetlev Technologies, Inc. And Raymond Li

14.     Florida Secretary of State records show that Raymond Li founded a company called Jetlev Sports, Inc. in August 2007, and that company then changed its name to Jetlev Technologies, Inc. ("JTI") in February 2011.  JTI still nominally exists on paper today at the address 1105/1111 Old Griffin Road in Dania Beach, Florida, with Mr. Li as an executive.  However, as discussed below, Jetlev LLC assumed JTI's business obligations and liabilities in early 2012, leaving JTI as essentially a "paper-only" entity.

15.     Mr. Li had a strong personal passion for water jetpacks.  He was awarded three patents for the technology, and led the first efforts to transform it into a new water sports industry.  Prior to the arrival of Seth Gerszberg, as discussed below, Mr. Li was very much the "patriarch" of his business, investing his personal drive and ambition into the company.  His original objective was to set up "dealerships" across the United States to sell the units at about $99,500 each.  Mr. Li also intended there to be commercial rental operations partnered with JTI to promote the new sport with the public at large.

16.     The original jetpack unit developed by JTI was called the "R200."  It consisted of (A) a floating hull containing an water pump engine (the exact same engine as would be used in a Jet Ski or similar watercraft), (B) a jetpack unit worn by the user

3

like a backpack with twin nozzles to expel jets of water in order to generate lift, and (C) a hose connecting the hull/engine assembly to the jetpack.  JTI made these units upon demand in-house rather employing a mass-manufacturing operation, though JTI's business plan was to commence such an operation.

17.    JTI had numerous business partners, both to serve as his "dealerships," as well as third-party rental operations to promote the jetpacks to tourists, as well as a network of suppliers and supporters.  Mr. Li intended to work with these business partners to increase awareness of jetpack technology in the public consciousness, and, importantly, to learn what customers needed so as to help JTI develop a better second generation mass market product at a lower price point.  These third parties - including some of the Plaintiffs herein - were invested in growing JTI's business and working with JTI as partners to promote jetpack technology to a broad consumer base, rather than any narrow demographic.  The expectation of the parties - both JTI and its business partners - was that their relationships would grow and expand, and that Mr. Li's plan for JTI was to transition to mass manufacturing once the second generation product designs were completed.  In short, JTI and its business partners operated, both expressly in their agreements, and implicitly in their course of dealing, with the expectation that JTI would be expanding to service a mass-market rental and sales operation across the United States and internationally.

18.    JTI business partners experienced early success in 2011, opening rental operations to enthusiastic customers, and rapidly garnering attention to the new this new watersport.

## Mr. Gerszberg Takes Control Of Jetlev

19.    Mr. Li fell on hard times with his own personal finances by the end of 2011. It was at this point that New York-based entrepreneur Seth Gerszberg took an interest in Mr. Li's company. Mr. Gerszberg is best known for founding the popular clothing company MEE Apparel, which retailed under the well-known brand name "Eck? unltd." In 2009, the company reportedly had over $1 billion in global revenue and was the largest

4

brand in streetwear.   When MEE Apparel later filed for bankruptcy in 2014, Mr. Gerszberg became the bidder for millions of dollars of its assets through one of his other companies, Schuman LLC.

20.   Upon information and belief, Mr. Gerszberg has a history of making money by either assuming control of the revenue streams from pre-existing businesses, or through an intellectual property licensing model.   The advantage of both of these strategies to Mr. Gerszberg is that they supply a passive revenue stream, and can be implemented remotely from New York.

21.   Mr. Gerszberg took a personal interest in water jetpack technology and, sometime in 2011, embarked on a course of dealing that would result in his ultimately wresting control of Raymond Li's business.   Upon information and belief, Mr. Gerszberg viewed Mr. Li and someone who could be easily controlled because of his weakened financial condition, and Mr. Gerszberg intended to secure for himself ultimate control of the JTI revenue streams, and Mr. Li's patents on the jetpack technology so that they could be licensed.

22.   In mid-to-late 2011, Mr. Gerszberg entered into a loan agreement with Mr. Li and JTI whereby Mr. Gerszberg supplied funding to assist Mr. Li and JTI.   It was at this point that Mr. Gerszberg announced his intention to become Mr. Li's "business partner," and began having a say in the operations of JTI.   Mr. Gerszberg employed money as leverage to gain control.   By some accounts, Mr. Gerszberg had already leveraged significant control of JTI by the end of 2011 through the use of loans to Mr. Li.

23.   On November 30, 2011, Mr. Gerszberg formed the entity JLSG, LLC ("JLSG") in New Jersey.   It is understood that JLSG, appropriately, stands for "Jetlev Seth Gerszberg," thus reflecting the alter ego nature of relationship.   Mr. Gerszberg exercises sole control over JLSG and employs it as his personal corporate tool.   The next day, on December 1, 2011, the twin Delaware entities Jetlev, LLC ("Jetlev") and JLIP, LLC ("JLIP") were formed with the objective that Jetlev would replace JTI, and that JLIP would be the intellectual property holding company for Jetlev.   Mr. Gerszberg was a

5

manager of both companies.  As described more fully later, each of Mr. Gerszberg and Mr. Li had an approximate 50% ownership interest in Jetlev.  JLIP was owned 50/50 by Mr. Li and Mr. Gerszberg.  On paper, Mr. Li was to share equal managerial control of both companies, but Mr. Gerszberg ignored this corporate form and exercised personal control of both entities, with Mr. Li being too under-capitalized to raise any effective protest.  In essence, Mr. Gerszberg defrauded Mr. Li out of control of his business.

24.    JLSG was Mr. Gerszberg's vehicle to provide his own personal funding to Jetlev and JLIP.  Mr. Gerszberg, in his individual capacity, also supplied funding to the Jetlev entities.  Upon information and belief, Mr. Gerszberg also funneled money from his other companies to various Jetlev operations, never keeping proper accounting of such transfers.

25.    Florida Secretary of State records indicate that Jetlev and JLIP applied for a license to do business in Florida in January 2012, and that both established their headquarters at 1111 Old Griffin Road, Dania Beach, Florida, which was also JTI's address.  1111 Old Griffin Road is a commercial building adjoined by 1105 Old Griffin Road, which has more recently served as an address for Jetlev and JLIP.  The buildings housed the manufacturing operation that built the jetpacks, as well as corporate offices.  JLSG signed the Florida license paperwork as each of Jetlev, LLC's and JLIP's authorized representative.

26.    Mr. Gerszberg gained control over Mr. Li's business through what was called a "**Joint Venture Agreement**," dated January 1, 2012 (attached here as **Exhibit 1**).  Under the Joint Venture Agreement, JTI was effectively merged into Jetlev, LLC by Mr. Gerszberg.  JTI transferred all of its assets to Jetlev, and Jetlev assumed effectively all of JTI's debts and obligations.  (Ex. 1, p. 1).   Mr. Gerszberg was bound, through JLSG LLC, to provide funding to Jetlev sufficient to keep it in business and supply "working capital to meet predefined criterial [such as] financing of raw parts orders to meet [customer] orders with deposits."  (Ex. 1, p. 2).

27.    JLSG is a mere fiction, existing for no other purpose than to allow the

6

funneling of money between Mr. Gerszberg and the Jetlev entities.

28.     The Joint Venture Agreement further contemplated that Mr. Gerszberg would "*provide, at no cost to [Jetlev], personnel to serve as President, and as VP of Marketing...[and] the services of Ecko's general counsel...[and] the advisory services of Seth Gerszberg and...graphic media design and media placement services at no cost to Jetlev LLC....Ray [Li], Jetlev Technologies, Inc., [] shall have no obligation to fund additional capital contributions or make loans to [Jetlev]*."  (Ex. 1, p. 2).  Mr. Gerszberg had thus made himself personally responsible for running almost every aspect of the Jetlev business, and for keeping it financially afloat and operational.  He also intertwined Jetlev operations with those of his other businesses, all of which were under his direct and personal control.

29.     The "Governance" section of the Joint Venture Agreement provided that Mr. Gerszberg and Mr. Li had to jointly approve all "major actions" of Jetlev.  (Ex. 1, p. 3).  However, Mr. Gerszberg disregarded this provision and asserted complete control over Jetlev in violation of the Joint Venture Agreement.

30.     The Joint Venture Agreement also included an assignment of all of Mr. Li and JTI's intellectual property to JLIP, with the exception of Mr. Li's patents, which Mr. Li retained personal ownership of (for the time being).  JLIP is referred to in the Joint Venture Agreement as a "trademark holding company."  (Ex. 1, p. 4).

31.     Under the Joint Venture Agreement, Jetlev was to assume all assets and liabilities of JTI.  Indeed, Jetlev physically stepped into JTI's shoes, assuming complete control of JTI's facilities, employees, website, phone numbers, etc.  Jetlev had no other office location or assets beyond those it inherited from JTI.

32.     Jetlev, under Mr. Gerszberg's direction, deliberately failed to draw a distinction between itself and JTI, leading many to assume that they were one and the same entity.  For several months in the wake of the Joint Venture Agreement, various customer communications and important documents continued to refer to JTI in error, or referred generically to "Jetlev" without informing third parties that Jetlev was now in

7

control rather than JTI. To the extent that any corporate documents or communications purported to emanate from JTI rather than Jetlev after the Joint Venture Agreement, those documents and communications should be interpreted as a matter of law to have emanated from Jetlev. The same is true for any corporate action and customer interactions that occurred after the Joint Venture Agreement. Absent discovery of new facts heretofore unknown to Plaintiffs, all evidence indicates that Jetlev stepped fully into JTI's shoes, and assumed all of JTI's contracts and liabilities, rendering JTI effectively a "paper-only" entity.

33. Regardless of anything contemplated by the Joint Venture Agreement, Mr. Gerszberg has at all times since at least the start of 2012 been the de facto executive in charge of all Jetlev operations for all the Jetlev entities. Although Raymond Li was nominally one of the managers of both Jetlev and JLIP, he ultimately had no say in the operation of the companies. Corporate records show that at some point in the first half of 2014, Raymond Li was removed as a manager of Jetlev, leaving only Mr. Gerszberg as a manager. Although Mr. Li is still a 50% manager of JLIP, he has been completely cut out of the business, and JLIP takes all corporate actions without seeking his approval or even informing him.

34. Mr. Gerszberg co-mingled his own money with that of Jetlev and JLIP, and operated the businesses without conducting proper board meetings, keeping proper records, or setting proper policies on how money could be withdrawn from the company by him or its executives. This information has been attested to by many former Jetlev employees with first-hand knowledge of Jetlev's day-to-day business practices.

35. In mid-to-late 2011 – well before the Joint Venture Agreement had been executed – Mr. Gerszberg installed his brother-in-law, Benjamin White, as *de facto* new President of JTI. By the start of 2012, the title became official, with Mr. White designated as President of Jetlev. Mr. White had no past experience that would qualify him for a role of this kind, and was given the job solely because he was Mr. Gerszberg's brother-in-law and could be directly controlled by Mr. Gerszberg from New York. Mr.

White acted under the direction and control of Mr. Gerszberg, and quickly supplanted Mr. Li.   Per the Joint Venture Agreement, Mr. White's authorization (and thus Mr. Gerszberg's) was required for any withdrawal of more than $2,500 (or $5,000 aggregate in a month) from Jetlev and JLIP bank accounts.   Through Mr. White, Mr. Gerszberg maintained complete control over the business.   To help guarantee Mr. White's compliance, Mr. Gerszberg paid for him to have an expensive residence near Jetlev, and set his salary at close to $400,000 per year.

36.     Mr. Gerszberg forbade Jetlev from soliciting funds from any other corporate investors so that Mr. Gerszberg's control of Jetlev would not be threatened.   Mr. Gerszberg insisted upon this even when the company was dangerously undercapitalized.

37.     Mr. Gerszberg further exercised improper personal control over Jetlev (and JLIP) by employing his own personal attorneys to manage legal affairs for the companies, even though at least one of these attorneys had no attorney-client relationship with Jetlev/JLIP, and at least one other was a quasi-employee whose salary (or at least a significant part of it) appears to have been sourced directly from Mr. Gerszberg.   Jetlev and JLIP should have had their own counsel who answered only to the legal interests of Jetlev and JLIP.   Instead, Mr. Gerszberg used attorneys loyal to (and paid by) himself, who improperly purported to be acting in the interests of Jetlev and JLIP, when they were in fact acting only in Mr. Gerszberg's personal interests.   To the extent that Mr. Gerszberg directed Jetlev or JLIP assets to compensate these attorneys for work that was, in truth, performed for himself, Mr. Gerszberg further abused the corporate form of Jetlev and JLIP.

38.     Under the Joint Venture Agreement, Jetlev was to pay Mr. Li a six-figure salary, extinguish certain loans, and provide him a leased corporate vehicle.   Mr. Gerszberg however, refused to allow Jetlev to provide this promised compensation to Mr. Li.

39.     In August 2012, Mr. Li prepared a press release (attached here as **Exhibit 2**) announcing his diminished role in the company.   It was effectively a retirement

9

announcement.  The press release explained that "*Under the Joint Venture Agreement, Jetlev, LLC can call on a multi-million dollar capital pool through Seth, who would transfer funds through Ecko Enterprises.  Jetlev, LLC has a license to use the Jetlev trademark and the intellectual property for water jet personal propulsion technology.  The joint venture brought into the new operating company a large pool of available capital, a seasoned executive team and in-house legal expertise to help ramp up production and expand the Jetlev market domestically and internationally. Benjamin White is the president who is in charge of all day-to-day management responsibilities, while Raphie Aronowitz is VP of Marketing of Jetlev, LLC. My role as the Jetlev inventor and founder of Jetlev Technologies, Inc. will continue at Jetlev, LLC only as a part owner and senior technical consultant*."  Thus, Mr. Li confirmed that he had been supplanted at Jetlev by Mr. Gerszberg, who was expected to "call on a multi-million dollar capital pool" to keep the company operational and successful.

40.     Mr. Li's announcement said nothing of any fundamental change in Jetlev operations, and quite to the contrary, promised that Jetlev would continue its existing operations, and solicited Jetlev's business partners to provide continued support for the company.

### Mr. Gerszberg Wipes The Slate Clean On The Pre-Existing Jetlev Business

41.     Mr. Gerszberg embarked upon a deliberate effort to "wipe the slate clean" on the pre-existing Jetlev business and consolidate control over the jetpack industry and the jetpack intellectual property.  Rather than invest resources in Jetlev's existing business model and support Jetlev's existing customers, Mr. Gerszberg sought to capitalize on third party jetpack businesses, and become the principal licensor of intellectual property rights worldwide.  This would allow him to receive a steady flow of passive income from the business, without having to expend the effort of developing Jetlev's own internal manufacturing efforts or continuing Mr. Li's existing business model.

42.     Mr. Gerszberg's plans were improper for several reasons.  First, they were

10

**COMPLAINT**

done without the consent and authority of Mr. Li, who was supposed to have equal input on any such matters.  Mr. Gerszberg treated the business as his own private company without answering to Mr. Li, and indeed even entered into improper negotiations to sell a significant share of the business without Mr. Li's consent, as will be discussed below. Mr. Gerszberg ultimately forced Mr. Li to abdicate ownership of his patents under duress. Second, Mr. Gerszberg did not honor the contractual and warranty obligations owed to existing business partners and customers, instead allowing them to flounder by deliberately underfunding the existing commercial operations.   Mr. Gerszberg deliberately kept hidden from existing and prospective business partners and customers the fact that he was taking Jetlev in a new direction that could not support them or the original business model.  This was to prevent these third parties from raising any protest, and to induce them to continue to invest money that Mr. Gerszberg could apply to other purposes.  Jetlev's fraudulent actions caused these unsuspecting third parties to lose large amounts of money.  Third, Mr. Gerszberg, along with other Defendants named herein, ultimately engaged in the practice of taking money from prospective purchasers of jetpacks, and then never delivering the equipment, hiding behind a false claim of bankruptcy while fraudulently transferring Jetlev's remaining assets to a new company, Aquaflier.

43.    At the outset in 2012, Mr. Gerszberg briefly invested in an ill-considered effort to market the jetpacks exclusively to wealthy yacht owners (rather than the general public, as Mr. Li had intended).  He diverted an unreasonably large amount of money to this endeavor, paying a small staff several hundred thousand dollars to attempt sales directly to yacht owners in Ft. Lauderdale and the Caribbean.   Mr. Gerszberg soon cancelled the project when it proved a complete failure.  During this time, Jetlev's pre-existing business operations were left dangerously underfunded.  Pre-existing customers, including the dealership and rental operation partners, were not given proper warranty support, were allowed to flounder, and were not informed that Mr. Li's original business model had been replaced.

11

COMPLAINT

44.     Mr. Gerszberg began using money from prospective new customers for improper purposes.  On such instance is described here as an example.  A close friend of Mr. Gerszberg named Matthew Rosenblatt had loaned Mr. Gerszberg several hundred thousand dollars.  In September 2012, a prospective Jetlev customer named Barry Berger approached Jetlev wanting to become a rental operator business partner like the other the other jetpack rental operators that had started under Mr. Li's tenure.  Unaware that Mr. Gerszberg was shutting down the old Jetlev business operations, Mr. Berger offered to pay almost $200,000 as a deposit on the purchase of several jetpacks.  Instead of informing Mr. Berger that Jetlev would no longer be able to support such a business model, Jetlev took the money.  Mr. Gerszberg then withdrew the money from Jetlev to repay his loan from Mr. Rosenblatt.  Mr. Berger never received his promised jetpacks.

45.     Mr. Gerszberg deliberately avoiding keeping proper accounting records.  A qualified accountant who was originally working at the company was forced out in early 2012, and replaced by an unqualified bookkeeper.  Mr. Gerszberg's brother-in-law, Mr. White, kept a personal notebook of Jetlev accounts that he kept to himself and only shared with Mr. Gerszberg.  Mr. Gerszberg also improperly used JTI's bank account rather than opening a new one for Jetlev, making it impossible to accurately track financial transactions, and keeping business partners further in the dark about the true structure of the company.  Upon information and belief, Mr. Gerszberg (and later Mr. Rosenblatt) took advantage of this loose bookkeeping environment to manipulate finances at their convenience, hide company finances from Mr. Li, and avoid recording any improper transactions.

46.     On July 2, 2012, Mr. Gerszberg caused Jetlev to file a patent infringement lawsuit against a company called Flyboard, which was Jetlev's largest competitor.  See S.D. Fl. Case No. 12-61323.  This was part of Mr. Gerszberg's effort to leverage control over third parties that could supply him with a passive revenue stream, instead of addressing the pre-existing obligations of the Jetlev business.  The Flyboard lawsuit would last a year and cost a significant amount of money, drawing critical resources and

attention away from Jetlev's original manufacturing and sales business.   Many then-employees of Jetlev (who themselves were never made fully aware of what Mr. Gerszberg was doing until it was too late) expressed dismay and confusion as to why this happened, and credited the redirection of resources to the lawsuit with rendering Jetlev incapable of servicing its existing customers.

47.     Mr. Li was named as a plaintiff in the suit because he was still (for the time being) the owner of the jetpack patents, and his nominal presence on the complaint was required to secure standing.   The lawsuit was, however, orchestrated by Mr. Gerszberg, as was known by the employees working at Jetlev at the time.

48.     Instead of selling water jetpacks, Flyboard sold water "jetboards" which resemble snowboards except that they expel water to propel the wearer.   The principal defendant in the case was a Florida company operated by Kim Robinson that acted as the US distributor for a French company owned by Frankie Zapata.   Mr. Zapata is the owner of several patents on the Flyboard design, and runs an international Flyboard distribution operation that was regarded as the primary competition for Jetlev.   Mr. Gerszberg attempted to use the lawsuit as leverage to negotiate a worldwide agreement with Mr. Zapata concerning the sale of jetpack products and licensing of jetpack intellectual property.

49.     Upon information from those with direct knowledge, Mr. Gerszberg sent his personal lawyers to France to negotiate a deal with Mr. Zapata on terms favorable to Mr. Gerszberg personally, rather than Jetlev.   When this failed, Mr. Gerszberg traveled to France himself and appeared to have successfully negotiated a worldwide jetpack alliance with Mr. Zapata.   Mr. Gerszberg cut Mr. Li out of these negotiations and purported to commit Jetlev to various proposed business plans that would have fundamentally changed the company without authority from Mr. Li, and which would have drastically diminished Mr. Li's interests in the company.   At this point, however, Mr. Zapata came into possession of Mr. Gerszberg's mobile phone and discovered communications indicating that Mr. Gerszberg intended to take control of Mr. Zapata's operations.   Mr.

13

Zapata cut off the deal, and the Flyboard lawsuit ended in a "walk-away."

50.     Around the same time as the Flyboard lawsuit came to a close, Jetlev announced that it would soon be releasing a new product called the "Aquaboard" which was essentially equivalent in design to Mr. Zapata's patented Flyboard.  Jetlev also indicated that it planned to release an improved jetpack product called the "Aquaflyer" to replace the pre-existing Jetlev R200 units.  Upon information and belief, these new product ideas had been conceived with the expectation that Mr. Zapata (rather than Jetlev) would support their manufacture, before Mr. Zapata broke off negotiations with Mr. Gerszberg.  Despite having no way to manufacture these proposed devices, Jetlev posted photos on their website of the supposed Aquaboard and Aquaflyer units, stating that they would be available by November 2013, and encouraging people to make deposits.  However, the Aquaboard and Aquaflyer were not actually in production, and it was later revealed that the photographs were shot using components from Mr. Zapata's Flyboard equipment.

51.     As part of his effort to "wipe the slate clean" on the pre-existing Jetlev operations and gain control over the intellectual property, Mr. Gerszberg allowed Jetlev's business to fail and to be underfunded until Mr. Li was financially unable to remain involved and was forced to abdicate his ownership of the patents.  US Patent Office records indicate that in September 2013, Mr. Li sold all of his jetpack patents to JLIP. Mr. Li was then shown the door, and moved back to Canada.

52.     In 2013, Jetlev also sought to gain control over Shanghai-based Stratospheric Industries, Inc., which had launched a highly successful jetpack product called the X-Jetpack for a tenth the cost of the Jetlev R200.  Citing his ownership of the jetpack patents, Mr. Gerszberg demanded that Stratospheric effectively subrogate themselves to Jetlev, which would allow Mr. Gerszberg to secure a passive revenue stream while not having to invest in Jetlev pursuing its own manufacturing and sale operations.  Stratospheric did not comply, but did agree to supply one of its X-Jetpacks to Jetlev pursuant to a Non-Disclosure Agreement on the promise that Jetlev would provide

feedback to Stratospheric.  Instead, Jetlev, at the direction of Mr. Gerszberg and Mr. Rosenblatt, dismantled and attempted to reverse engineer the X-Jetpack in violation of the Non-Disclosure Agreement and after Stratospheric had demanded the unit's return.

### Mr. Gerszberg and Mr. Rosenblatt Falsely Claim Bankruptcy
### While Shifting Assets to a New Company, Aquaflier

53.     In July 2013, putting the nail in the coffin of the pre-existing Jetlev business, Mr. Gerszberg installed his close friend and confidante Matt Rosenblatt as the newly-named "CEO" of Jetlev, removing his brother-in-law Benjamin White in the process. Mr. Rosenblatt proceeded to fire most of the small remaining staff of Jetlev, rendering it completely incapable of doing business.  Mr. Rosenblatt assumed the role of the face of Jetlev to its business partners and new customers.  However, Mr. Rosenblatt still took orders directly from Mr. Gerszberg.  In response to an email from one of the Plaintiffs in October 2013 seeking to confirm whether Mr. Gerszberg was still running the business, Mr. Rosenblatt replied unambiguously that "He [Mr. Gerszberg] and I are one in [sic] the same."

54.     The fact that Mr. Rosenblatt was shutting down Jetlev was not made known to existing and potential customers, who Mr. Rosenblatt actively encouraged to continue making deposits for new equipment that Jetlev knew could not be delivered.  Jetlev's website continued to advertise the Aquaboard and Aquaflyer products as available for purchase and delivery, and Jetlev continued to take money from customers who did not suspect that anything was amiss.  Customers who required warranty assistance were falsely told that their claims were being handled.  All of these misrepresentations were made with deliberate intent to draw as much money as possible into Jetlev, while simultaneously preventing customers from pursuing valid legal claims against the company.

55.     By November 2013, Mr. Rosenblatt began telling certain persistent customers who were demanding status updates that Jetlev either already had, or was about to, enter bankruptcy, and that as a result they would not be getting back any of their

15

money.  This had the effect, as was deliberately intended by Jetlev when it made the misrepresentations, of causing numerous customers to abandon their claims for tens or even hundreds of thousands of dollars in reliance on Jetlev's false representation that it was subject to federal bankruptcy protection.  Jetlev also never went back to any of these third parties to tell them that the company had not, in fact, gone bankrupt, thereby deliberately perpetuating the fraud indefinitely.

56.    In reality, Jetlev never did, and still has not, declared bankruptcy.  No public inspection of Jetlev's finances has ever occurred.

57.    In March 2014, Mr. Gerszberg and Mr. Rosenblatt formed a new company called Aquaflier, LLC ("Aquaflier") in Florida.  Mr. Gerszberg and Mr. Rosenblatt created this entity with the expectation that it would pick up business without having to answer to Jetlev's pre-existing obligations.  They shifted any remaining assets of Jetlev to Aquaflier rather than using them to repay Jetlev's debts.  Thus, the purported Jetlev bankruptcy was employed as cover to fraudulently convey assets to a new company.

58.    Aquaflier registered its address with the Florida Secretary of State as being Mr. Rosenblatt's personal home residence.  However, Aquaflier's operations were based out of 1105/1111 Old Griffin Road, Dania Beach in Jetlev's business space.  This was done so that Aquaflier could easily appropriate Jetlev's assets. Aquaflier absorbed Jetlev's remaining inventory of equipment, its office space and supplies, and its website. Aquaflier even absorbed the same paperwork as Jetlev, by, for example, simply changing the name "Jetlev" to "Aquaflier" on the face of purchase order forms.  Aquaflier also used the same employees, with Matt Rosenblatt remaining, along with at least one Jetlev engineer, and the attorney who had previously been hired by Seth to act as Jetlev's lawyer.  Essentially, the sign on the door was changed from "Jetlev" to "Aquaflier."

59.    Although Aquaflier is registered to Mr. Rosenblatt, those with direct knowledge have stated that Mr. Gerszberg was actively involved in the formation and funding of Aquaflier, and has actively participated in the unlawful transfer of assets from Jetlev to Aquaflier.  Upon information and belief, a revenue-sharing agreement exists

16

between Mr. Gerszberg and Mr. Rosenblatt/Aquaflier, and Mr. Gerszberg operates Aquaflier in conjunction with Mr. Rosenblatt.

## Mr. Gerszberg And Mr. Rosenblatt Defraud The Courts

60.     In July and August of 2014, JLIP filed two patent infringement suits against third parties alleging infringement of one of Mr. Li's patents.  See S.D. Fl. Case Nos. 0:14-cv-61618-WJZ and 0:14-cv-61798-JIC.  This was the latest in Mr. Gerszberg's efforts to leverage the patents to secure a passive revenue stream.  However, Mr. Li was still a 50% manager-member of JLIP whose authorization would have been required to initiate such legal action.  Mr. Gerszberg and his attorneys knew this, but never sought permission from Mr. Li to file the lawsuits, and thus knowingly initiated two federal litigations without proper standing, thereby committing serial acts of fraud upon the courts.  Those lawsuits were actively litigated until midway through 2015 when they were stayed pending reexamination of the asserted patent.  Substantial resources of the federal courts and the defendants were expended in the litigations, which are still pending.

61.     A company called Aqua Jet Miami had lost an approximately $80,000 payment to Jetlev for jetpack equipment that was never delivered. Aqua Jet Miami sued Jetlev, Aqualflier and Matt Rosenblatt.  *See* Broward County Case Number CACE14003000.  Mr. Rosenblatt deliberately dodged service of process in this action, but he nonetheless took the time to submit an affidavit in that case under penalty of perjury in support of a motion for summary judgment stating that Aquaflier never inherited any assets from Jetlev.  This was a false statement to the court.

62.     Upon information and belief, Mr. Gerszberg and Mr. Rosenblatt have acted as they have because they believe Jetlev's customers to be too inconsequential and unsophisticated to raise any effective protest.  Despite several complaints having been made to the police, no action was taken against Jetlev, emboldening Mr. Gerszberg and Mr. Rosenblatt to continue with their plans.  Several persons filed lawsuits against Jetlev in Broward County, but these too were unsuccessful because they either named the

17

incorrect party (Jetlev Technologies, Inc. only) or because Jetlev simply refused to appear to engage in the litigation.  Jetlev has made repeated false claims of bankruptcy to dissuade persons from pursuing valid legal claims.

63.     It is estimated by Plaintiffs that there are at least 30 aggrieved parties who have lost money to the Defendants in a manner similar to that of the Plaintiffs here. Government authorities, including the Florida Attorney General's Office, have since attempted to follow up with some, but not all, of the Plaintiffs in this action who had previously made complaints before they knew the full facts of what transpired at Jetlev.

64.     Mr. Gerszberg has resumed negotiations with Mr. Zapata, hoping to capitalize on the full or partial sale of JLIP and/or its patents.  Mr. Zapata appears to have discovered, however, that Mr. Li still has 50% control of JLIP, and thus that Mr. Gerszberg is without corporate authority to effect the transfer.  In response to this, Mr. Gerszberg has now initiated two lawsuits against Mr. Li, the objective of which is plainly to coerce Mr. Li into relinquishing his remaining control of JLIP so that Mr. Gerszberg can pursue his intellectual property sale and/or lawsuit efforts uninhibited.

**Mr. Gerszberg And Mr. Rosenblatt Are Liable As Alter Egos Of The Jetlev Entities**

65.     Mr. Gerszberg and Mr. Rosenblatt have hidden behind the corporate veil of Jetlev to engage in the foregoing actions for their own personal gain.  Essentially, Mr. Gerszberg assumed control of an existing business through fraud, undermined that business, and defrauded customers and business partners in the process, none of whom were made aware of what Mr. Gerszberg was doing.  Mr. Rosenblatt ultimately joined this effort, and together with Mr. Gerszberg, fraudulently conveyed the remaining assets of Jetlev to a new company, Aquaflier.

66.     The facts supporting alter ego liability discussed both above and below are supported by information from interviews with multiple persons who have direct knowledge of the circumstances.

67.     Both Mr. Gerszberg and Mr. Rosenblatt co-mingled their personal assets with Jetlev's assets at their convenience, and then raided all the assets of Jetlev as they

18

dismantled the company.  Mr. Gerszberg has alternately mingled his own funds with Jetlev, and used JLSG, under his sole direction, to funnel cash between himself and Jetlev.  Mr. Gerszberg and Mr. Rosenblatt have not observed corporate formalities, did not keep adequate books or records, deliberately allowed Jetlev to be underfunded and understaffed such that it could not properly function or honor obligations, did not proceed with any proper bankruptcy procedures, used the dismantling of Jetlev as leverage to wrest control of the jetpack intellectual property for themselves, used the dismantling of Jetlev to avoid paying debts, and otherwise ignored any separateness between their own affairs and those of Jetlev (except when it suited them).

68.   Some of the specific acts supporting alter ego liability include (as were discussed further above):

a. pushing Mr. Li out of the business and taking important corporate actions without Mr. Li's approval in violation of the Joint Venture Agreement and Delaware LLC law;

b. ignoring the Joint Venture Agreement by not paying Mr. Li his promised salary as a means to wrongfully exclude him from the business;

c. diverting Jetlev assets to pay excessive amounts of money to Mr. Gerszberg's personal associates who either were not formally employed by Jetlev, or otherwise acted in Mr. Gerszberg's interests rather than in Jetlev's;

d. forbidding additional investors so that Mr. Gerszberg could maintain personal control of the business;

e. deliberately under-capitalizing Jetlev in the face of pre-existing contractual obligations to business partners and customers;

f. co-mingling personal assets with the company's assets and then removing assets at will without following any proper procedures or protocol;

g. withdrawing capital from Jetlev to repay personal debts;

h. using Jetlev to defraud Mr. Li into relinquishing control of his patents to JLIP;

19

4839-4297-7575.2

i. paying Jetlev's in-house lawyer (who was put in place by Mr. Gerszberg) either from Mr. Gerszberg's personal account or from the account of his fashion company, Ecko;

j. employing Mr. Gerszberg's in-house counsel from Ecko to manage important affairs for Jetlev and draft important agreements for Jetlev, even though Ecko counsel was not employed by Jetlev and had no attorney-client relationship with it;

k. failure to keep proper corporate records in a deliberate effort to cover up improper transactions;

l. improperly using JTI's accounts to prevent having a clear record of Jetlev's transactions;

m. unlawfully shifting assets out of Jetlev to other companies, such as Aquaflier (which Mr. Gerszberg and Mr. Rosenblatt set up at Jetlev's address to facilitate the asset transfer);

n. fraudulently telling customers that Jetlev was still engaging in normal business operations to secure deposits for equipment that Jetlev knew could not be delivered;

o. fraudulently telling customers that Jetlev was bankrupt to avoid corporate debts;

p. failing to declare bankruptcy to avoid public scrutiny of company records;

q. failure to hold board meetings of all the managers;

r. Mr. Rosenblatt put himself personally in charge of communicating with customers, including repeatedly telling them that their products would be delivered soon (when they would not be), and telling them that Jetlev was in bankruptcy (when it was not);

s. Mr. Rosenblatt acted on direct orders from Mr. Gerszberg, who Mr. Rosenblatt consulted with constantly and sought approval from, acting as Mr. Gerszberg's personal agent in Mr. Gerszberg's and in his own personal

20

4839-4297-7575.2

interest rather than the interests of the company and its customers;

t.   Mr. White had previously acted under the full control of Mr. Gerszberg.

69.   Mr. Gerszberg and Mr. Rosenblatt are thus properly considered the alter egos of Jetlev, and therefore jointly liable with Jetlev.   Adherence to the notion of separateness between Jetlev on one hand, and Mr. Gerszberg and Mr. Rosenblatt on the other, would sanction fraud and promote injustice.

70.   Although it is believed that Jetlev assumed all relevant liabilities from JTI such that JTI has no remaining liability in this action, it is possible that Mr. Gerszberg and Mr. Rosenblatt might contest this and seek to shift liability back to JTI.   To the extent that JTI is ever deemed to have maintained any liability separate from Jetlev, Mr. Gerszberg and Mr. Rosenblatt should be deemed alter egos of JTI because they wrongfully pushed out Mr. Li and took *de facto* control of all operations, treating JTI as if it simply were Jetlev, and using it to engage in the misconduct alleged herein.   The reality as of January 2012 was that any interactions with third parties that might have seemed to be with JTI were in fact happening with Jetlev, under the direction and control of Mr. Gerszberg, and also later Mr. Rosenblatt.

71.   Mr. Gerszberg has used JLSG as a corporate shield to engage in the foregoing acts, so JLSG is also liable and its corporate veil may be pierced to reach Mr. Gerszberg.   As shown above, JLSG carries on no legitimate business, and was used for no other purpose than as a vehicle for Mr. Gerszberg to personally funnel money between himself and Jetlev.   Adherence to the notion of separateness between JLSG on one hand, and Mr. Gerszberg on the other, would sanction fraud and promote injustice.

72.   Mr. Gerszberg has also used JLIP for his own personal advantage and without regard for corporate formalities in all the same ways that he used Jetlev, as described above.   In particular, although Mr. Li is a 50% manager of JLIP with a right to vote on its corporate actions, Mr. Gerszberg shut Mr. Li out and took control of the company for himself, using it as a vehicle to pursue an expensive litigation program without the authorization of Mr. Li.   Mr. Gerszberg used JLIP to initiate two separate

21

**COMPLAINT**

lawsuits in 2014 despite knowing that he lacked standing to do so, thereby perpetuating a running fraud on the courts. JLIP operates out of the same address as Jetlev, and Mr. Gerszberg treats them as the same company. Thus, adherence to the notion of separateness between JLIP on one hand, and Mr. Gerszberg on the other, would sanction fraud and promote injustice.

73. Mr. Rosenblatt and Mr. Gerszberg have employed Aquaflier for the fraudulent purpose of misappropriating Jetlev's assets. Aquaflier is not a legitimate corporate entity. It was registered using Mr. Rosenblatt's personal home address, yet its actual operations are at Jetlev's address in Dania Beach, where it has taken over Jetlev facilities and assets without abiding by any proper corporate formalities. Upon information and belief, Aquaflier has no board meetings and keeps no proper corporate or financial records. It was created for the convenience of Mr. Rosenblatt and Mr. Gerszberg for a fraudulent purpose, namely to wrongfully assume the assets of Jetlev and avoid Jetlev's liabilities. Adherence to the notion of separateness between Aquaflier on one hand, and Mr. Rosenblatt and Mr. Gerszberg on the other, would sanction fraud and promote injustice.

### JLIP, JLSG And Aquaflier Have Successor And/Or Alter Ego Liability

74. To the extent that Jetlev has effectively ceased to exist and is unable to account for its liabilities, JLIP, Aquaflier, and JLSG should each be held jointly liable for Jetlev's misconduct under a successor liability and/or alter ego theory. Each of JLIP, Aquaflier, and JLSG have assumed the assets of Jetlev, have the same employees and managers as Jetlev, and have failed to observe proper corporate formalities in isolating their businesses from Jetlev, or properly disposing of Jetlev's outstanding obligations to creditors. Jetlev cannot escape liability by shifting assets to other companies.

75. Furthermore, Mr. Gerszberg is an alter ego of JLIP, Aquaflier and JLSG – companies that he created to further the fraudulent business activities discussed herein, and that he has operated under his own control without regard for proper corporate formalities, and in contravention of the Joint Venture Agreement. In the case of

Aquaflier, Mr. Gerszberg shares alter ego liability with Mr. Rosenblatt.

## FACTUAL ALLEGATIONS PART II:
## ALLEGATIONS AS TO PLAINTIFFS

### JTI And Jetpack Enterprises Had A Significant Business Relationship

76.      In early 2011, John Morris – the founder of Plaintiffs' businesses – entered into discussions with Mr. Li.  Mr. Morris purchased several R200 jetpack units from JTI for just below their $99,500 sticker price, and set up a rental operation in Newport Beach. Jetpack Enterprises, LLC was formed in May 2011 and began operating under the trade name "Jetlev Southwest" (though there was no formal operating agreement between Mr. Li's business and Jetpack Enterprises).

77.      Jetpack Enterprises owned its jetpacks outright, and ran a successful rental operation for itself.  Dean O'Malley was brought on board as President of Jetpack Enterprises and to oversee day-to-day operations.  Jetpack Enterprises was also promised and paid a 15% commission from JTI (later absorbed by Jetlev) on jetpack sales that it arranged.

### Jetlev Induces Jetpack Enterprises To Enter One-Sided Agreements

78.      In 2012, Jetpack Enterprises became aware of Mr. White being appointed as the new President of Jetlev, but was unaware of (and was not informed by Jetlev of) the scale of changes that had occurred.  Confusingly, Jetlev never attempted to properly distinguish itself from JTI, conveying the impression that it was exactly the same company and that no fundamental change in management had occurred.  Jetpack Enterprises believed that Mr. Li was still involved in the business and that Jetpack Enterprises' business relationship with Jetlev would proceed according to the preexisting plan.

79.      In reliance on the promise that Jetlev would be able to supply additional jetpacks, Jetpack Enterprises expanded its operations and worked to establish a branch in Hawaii and set up clients with jetpack rental operations in other countries.  This was done at significant expense and effort on Jetpack Enterprises' part.

80.     There had never been a formal operational agreement between Jetpack Enterprises and Jetlev, although in January 2013, JLIP asked Jetpack Enterprises to execute a trademark licensing agreement.   This was a one-sided agreement intended primarily to insulate Jetlev, JLIP and Mr. Gerszberg from any potential liability stemming from Jetpack Enterprises' operations.   Indeed, the agreement appears to have been drafted by Mr. Gerszberg's personal attorney with a correspondence address in New York.   The agreement did not even convey the rights the mark "Jetlev" itself, which was already in use by Jetpack Enterprises.   Despite executing the trademark licensing agreement, almost immediately thereafter Jetpack Enterprises decided to drop the "Jetlev Southwest" name in favor of the brand name "Jetpack America."   The trademark licensing agreement expired after one year.

81.     While in effect, the trademark licensing agreement called for Jetpack Enterprises to use "Headzone helmets" in conjunction with its rental operations in exchange for Jetpack Enterprises' right to use certain Jetlev branding.

82.     In February 2013, Jetpack Enterprises executed an agreement with Jetlev entitled the San Diego Flight Center Agreement ("San Diego Agreement").   The San Diego Agreement provided that Jetpack Enterprises would pay Jetlev a fully refundable $85,000 deposit toward the possible future purchase of four Jetlev R200 jetpacks for use at a new San Diego facility.   In return, Jetlev was to provide exclusivity in the San Diego region.   Jetpack Enterprises paid Jetlev $85,000 under the San Diego Agreement.

83.     In actuality, there were no other competing jetpack operations in San Diego at the time, nor would there be in the months to come.

84.     In March 2013, Jetpack Enterprises – San Diego was formed to operate the San Diego branch of Plaintiffs' rental business.   Mr. O'Malley acted as President, still based out of Newport Beach.   The companies began to refer to themselves collectively by their brand name "Jetpack America."

85.     Around this same time, Jetlev began to noticeably fall behind in its business. Over the course of 2013, it became apparent that not only was Jetlev not delivering

24

4839-4297-7575.2

promised equipment, it was also not following through on financial obligations. Jetlev's conduct during 2013 included, among other things:

a.  After Jetpack Enterprises arranged the sale of two Jetlev jetpacks to a customer in Singapore, Jetlev was many weeks late with the delivery, which reflected very poorly on Jetpack Enterprises and caused significant strife with the customer. Indeed, the customer threatened Jetpack Enterprises with a lawsuit. Jetpack Enterprises was owed a 15% commission on the sales, the $18,000 balance of which was never paid by Jetlev.

b.  Jetlev had promised to deliver the Headzone helmets that it required under the trademark licensing agreement, but then failed to deliver those helmets, forcing Plaintiffs to purchase them itself for $2,415.

c.  On or about June 2013, Jetpack Enterprises accidentally wired $9,400 to Jetlev, but when Jetpack Enterprises asked for it be returned, Jetlev refused, and only relented after extensive and repeated follow up from Jetpack Enterprises.

d.  Plaintiffs' Jetlev jetpack rental equipment started experiencing severe mechanical failures that included broken water pumps and c-clamp ruptures. These failures caused the jetpack equipment to be inoperable and to require significant repairs. As a result, Plaintiffs lost business. When Plaintiffs sent parts to Jetlev for repair, they were not repaired and not returned. These parts belonged to Plaintiffs and were not the property of Jetlev. Dean O'Malley ultimately was required to travel to Jetlev in Florida and ship the materials back to Jetpack Enterprises himself.

e.  Jetlev was generally unresponsive to inquiries from Jetpack Enterprises, and hampered Jetpack Enterprises' ability to engage in jetpack sales by not giving Jetpack Enterprises sufficient access to information for pending customers. Jetpack Enterprises' reputation among jetpack purchasers was tarnished.

COMPLAINT

4839-4297-7575.2

## **Jetlev Induces Plaintiffs To Credit Money Owed**
## **Towards Jetpacks That Will Never Be Delivered**

86.     Jetpack Enterprises was not made aware of what was transpiring, and was instead induced to continue expanding its operations on the promise that Jetlev would be able to supply new jetpacks (the promised Aquaflyer and Aquaboard units).  In reliance on these false assurances, Plaintiffs expended time and money to promote Jetlev jetpacks and seek commission-generating customers, many of whom made deposits with Jetpack Enterprises in the anticipation of purchasing new jetpacks.  Jetpack Enterprises was thus putting its reputation on the line for Jetlev.

87.     Starting in July 2013, Mr. O'Malley engaged in a series of negotiations and discussions with Mr. Rosenblatt to try to get business back on course.  In reliance on the promise that Jetlev would imminently be releasing the Aquaflyer and Aquaboard on or about November 2013, Jetpack Enterprises put energy and effort into salvaging the relationship with Jetlev and promoting Jetlev products.  On or about August 2013, Jetpack Enterprises informed Jetlev that it wanted a refund of the $85,000 deposit it had made on the older model R200 units pursuant to the San Diego Agreement.  Jetpack Enterprises also requested payment of the long overdue $18,000 in commission payments on the Singapore sales, as well as compensation for the $2,415 that Jetpack Enterprises had paid to obtain new Headzone helmets.

88.     Mr. Rosenblatt led Mr. O'Malley to believe that Jetlev was merely facing a short term cash crunch, and that the best course of action was simply to credit the money that was owed to Jetpack Enterprises toward the purchase of new Aquaflyer and Aquaboard products, which would start being delivered on or about November 2013.  However, upon information and belief, the units were not in production, and Mr. Rosenblatt was merely trying to mollify Jetpack Enterprises long enough for Jetlev to be dismantled, and so that Defendants could keep Jetpack Enterprises' money.

89.     The terms of the proposed agreement were hashed out over numerous email exchanges and phone calls with Mr. O'Malley in California.  Mr. O'Malley drew up a

short contract ("Contract") memorializing the deal, and on November 7, 2013, travelled to meet Mr. Rosenblatt and obtain his signature.  That Contract is attached hereto as **Exhibit 3**.  Mr. O'Malley signed the Contract on behalf of Jetpack America, referring to the brand of both his companies.  In the Contract, Jetlev acknowledges and admits that it owed $105,422.80.  In exchange for the forgiveness of that debt, Mr. O'Malley agreed to accept delivery of 11 AquaFlyer units valued at $7,000 each, and 3 Aquaboard units valued at $6,300 each.  Mr. Rosenblatt signed the Contract on behalf of "Jetlev" as "President & CEO."  Attached to the Contract is a "Credit Memo" showing a $77,000 credit towards the purchase of the 11 AquaFlyers, and $18,900 towards the purchase of the 3 Aquaboards.  A separate spreadsheet entitled "Jetlev/Jetpack America Running Balance" is also attached, summarizing the bases of the debts owed.  The understanding between the parties was that the units would start being delivered before the end of 2013, and the Contract requires Jetlev to provide parts and services at 50% off until the final unit had been delivered "to ensure timely delivery."

90.    Jetlev never delivered any of the Aquaflyers or Aquaboards, and has not returned any of the money that was owed.

## Jetlev Falsely Claims To Have Gone Bankrupt
## To Induce Plaintiffs To Give Up Their Claim

91.    Mr. Rosenblatt continued to lead Mr. O'Malley to believe that the promised jetpacks were merely delayed, and that Jetlev they would still be delivering them imminently.  In fact, Mr. Rosenblatt knew that the units were not going to be available, and indeed that they were not even being produced.

92.    Finally, in April 2014, after months of frustration and dealing with prospective customers who had made deposits for the new jetpacks, Mr. O'Malley travelled to Jetlev headquarters to check on the status of the promised units.  Mr. Rosenblatt did not come to the Jetlev office when Mr. O'Malley arrived, and Mr. O'Malley was instead forced to track him to a local motorsports store where Mr. Rosenblatt was known to go to evade upset customers.  Mr. Rosenblatt informed Mr.

O'Malley that he was in the midst of bankrupting Jetlev with plans to launch the new jetpack systems under a new company.  Mr. Rosenblatt stated that, since the Contract was signed by him as a representative of Jetlev, which was now bankrupt, Jetlev would not be honoring the terms of the Contract, and Jetpack Enterprises would not be repaid any of its money.  Mr. Rosenblatt then offered to allow Mr. O'Malley to buy new units from his new company for a similar price that was negotiated in the Contract.  Defendants' new company, however, was nowhere close to being able to deliver new products, and in fact has never launched the Aquaboard and Aquaflyer units.

93.     Based on Mr. Rosenblatt's assertion that Jetlev was now bankrupt, Plaintiffs cut ties with Jetlev, and Jetlev similarly ceased communications with Plaintiffs.  As far as Plaintiffs were made to believe, the relationship was over and their money had been lost. Jetpack Enterprises was forced to return the deposits from customers who wanted to purchase the Aquaboard and Aquaflyer, which was damaging to Plaintiffs' reputation. Plaintiffs had been counting on the new Jetlev units to supplement their existing business, and had invested considerable time, money and effort in reliance on Jetlev's assurances. Jetpack Enterprises lost profits on the sales it would have made on the new units.

94.     Relying on Mr. Rosenblatt's statement that Jetlev had gone bankrupt and would not be refunding the money that was owed, Plaintiffs were induced to abandon the Contract and assume that the money was lost.  However, unbeknownst to Plaintiffs, Jetlev never went bankrupt.

95.     In early 2014, believing Jetlev to have gone out of business, Plaintiffs established a relationship with Stratospheric Industries.  On August 6, 2014, without any warning, JLIP sued Plaintiffs and Stratospheric for patent infringement.  *See* S.D. Fl. Case No. 14-61798.  As noted above, JLIP was without corporate authority (and hence standing) to take this action.

## CLAIM I – BREACH OF CONTRACT

96.     Plaintiffs hereby incorporate the paragraphs of the Factual Background sections above as if stated fully herein.

97.     This is a claim by Plaintiffs against Jetlev for breach of contract.

98.     The Contract represented a binding agreement by which Jetlev was to have provided Plaintiffs with $95,900 worth of equipment in exchange for forgiveness of Jetlev's $105,422.80 debt to Plaintiffs.

99.     Plaintiffs fully performed their obligations under the Contract by forebearing from collecting the $105,422.80 of their funds and allowing said funds to be credited toward the purchase of the promised new jetpacks.

100.    Jetlev completely failed to deliver any of the promised equipment and has not otherwise repaid Plaintiffs on amounts that were owed.  Instead, Jetlev falsely claimed to have gone bankrupt to avoid performance.  Jetlev has thus materially breached the Contract to such an extent that the breach amounts to a total failure of consideration.

101.    Plaintiffs' damages because of said breach are $105,422.80 (plus interest), in addition to costs associated with time, money and effort expended in reliance on Jetlev's promise to provide new equipment, and lost profits when that equipment was not delivered.  Plaintiffs also suffered reputational injury.

102.    Plaintiffs are also and/or in the alternative entitled to rescission, restitution and compensatory damages to make them whole.

103.    The foregoing claims by all Plaintiffs are directed not only to Jetlev, but to Mr. Gerszberg and Mr. Rosenblatt in their personal capacities as alter egos of Jetlev, and to the extent Mr. Gerszberg or Mr. Rosenblatt personally engaged in the conduct alleged.

104.    To the extent that any defendant attempts to shift liability to JTI, Mr. Gerszberg and Mr. Rosenblatt should be deemed alter egos of that entity as well for the reasons discussed elsewhere above.

105.    Furthermore, to the extent that Jetlev is defunct and unable to account for its liabilities, JLIP, Aquaflier and JLSG should be held jointly liable for any acts by Jetlev because they are the successors in interest to Jetlev, and/or Jetlev's alter egos.  Mr. Gerszberg is further an alter ego of all these entities, and Mr. Rosenblatt is an alter ego of Aquaflier.

4839-4297-7575.2

## **CLAIM II - FRAUD**

106.   Plaintiffs hereby re-allege the paragraphs of the Factual Background sections above as if stated fully herein.

107.   This is a claim by Plaintiffs for fraud against Jetlev, as well as against Mr. Gerszberg and Mr. Rosenblatt, and each of them, in their personal capacities.

108.   Jetlev, under the direction of Mr. Gerszberg and Mr. Rosenblatt, led Plaintiffs to believe that Jetlev would continue to support Plaintiffs' businesses with new jetpacks.  This was a material misrepresentation, however.  Jetlev's actual goal was to placate Plaintiffs long enough for Jetlev's pre-existing business to be dismantled.  Jetlev was aware that Plaintiffs were investing time and money in reliance on Jetlev's assurances, but were content to allow Plaintiffs to continue to do so to prevent Plaintiffs' suspicions from being raised, and so that Jetlev could keep Jetpack Enterprises' money.

109.   Jetlev knew at the time it entered into the Contract that it would not be able to deliver the promised equipment, but used the Contract as a ruse and intentional misrepresentation to mollify Plaintiffs and avoid paying the $105,422.80 that was owed.

110.   In forebearing from collecting the $105,422.80, Plaintiffs justifiably relied upon Jetlev's material misrepresentation that the money would be credited toward the purchase of new equipment that would be delivered within the next several weeks.

111.   As a direct and proximate cause of the misconduct herein alleged, Plaintiffs suffered damages of $105,422.80 (plus interest), in addition to costs associated with time, money and effort expended in reliance on Jetlev's promise to provide new equipment, and lost profits when that equipment was not delivered.  Plaintiffs also suffered reputational injury.

112.   Later, Jetlev engaged in a second fraud by inventing the fiction, and making the intentional and material misrepresentation, that it was going into bankruptcy and that all of its obligations to Plaintiffs – including those under the Contract – were discharged.

113.   In fact, Jetlev never went into bankruptcy, and Jetlev's intention was to convince Plaintiffs to abandon their claims and the money that was owed.

30

4839-4297-7575.2

114.    Plaintiffs justifiably relied upon Jetlev's material misrepresentations that it had gone bankrupt, and consequently suffered damages when it was induced to give up its claim to the $105,422.80 that was owed.

115.    As a direct and proximate cause of the misconduct herein alleged, Plaintiffs suffered damages of $105,422.80 (plus interest), in addition to costs associated with time, money and effort expended in reliance on Jetlev's promise to provide new equipment, and lost profits when that equipment was not delivered.  Plaintiffs also suffered reputational injury.

116.    Mr. Gerszberg's and Mr. Rosenblatt's conduct reflects a callous disregard for Jetlev's business partners and customers, as well as a disregard for corporate formalities and obligations.  In doing the acts hereinabove alleged, Jetlev, Mr. Gerszberg and Mr. Rosenblatt acted fraudulently, oppressively, and maliciously and, by reason thereof, Plaintiffs are entitled to exemplary and punitive damages.

117.    The foregoing claims by all Plaintiffs are directed not only to Jetlev, but to Mr. Gerszberg and Mr. Rosenblatt in their personal capacities as alter egos of Jetlev, and to the extent Mr. Gerszberg or Mr. Rosenblatt personally engaged in the conduct alleged.

118.    To the extent that any defendant attempts to shift liability to JTI, Mr. Gerszberg and Mr. Rosenblatt should be deemed alter egos of that entity as well for the reasons discussed elsewhere above.

119.    Furthermore, to the extent that Jetlev is defunct and unable to account for its liabilities, JLIP, Aquaflier and JLSG should be held jointly liable for any acts by Jetlev because they are the successors in interest to Jetlev, and/or Jetlev's alter egos.  Mr. Gerszberg is further an alter ego of all these entities, and Mr. Rosenblatt is an alter ego of Aquaflier.

## CLAIM III – PROMISSORY FRAUD

120.    Plaintiffs hereby re-allege the paragraphs of the Factual Background sections above as if stated fully herein.

121.    This is a claim by Plaintiffs for promissory fraud against Jetlev, as well as

31

4839-4297-7575.2

against Mr. Gerszberg and Mr. Rosenblatt, and each of them, in their personal capacities.

122.    Jetlev, under the direction of Mr. Gerszberg and Mr. Rosenblatt, promised and led Plaintiffs to believe that Jetlev would continue to support Plaintiffs' businesses with new jetpacks.   Jetlev's goal, however, was to placate Plaintiffs long enough for Jetlev's pre-existing business to be dismantled.   Jetlev was aware that Plaintiffs were investing time and money in reliance on Jetlev's assurances, but were content to allow Plaintiffs to continue to do so to prevent Plaintiffs' suspicions from being raised, and so that Jetlev could keep Jetpack Enterprises' money.

123.    Jetlev knew at the time it made such promises and entered into the Contract that it would not be able to deliver the promised equipment, but used the Contract as a ruse to mollify Plaintiffs and avoid paying the $105,422.80 that was owed.

124.    In forebearing from collecting the $105,422.80, Plaintiffs justifiably relied upon Jetlev's promises that their business would be supported and that the money would be credited toward the purchase of new equipment that would be delivered within the next several weeks.

125.    Defendants' promises were fraudulent.   As a direct and proximate cause of the fraud herein alleged, Plaintiffs suffered damages of $105,422.80 (plus interest), in addition to costs associated with time, money and effort expended in reliance on Jetlev's promise to provide new equipment, and lost profits when that equipment was not delivered.   Plaintiffs also suffered reputational injury.

126.    Mr. Gerszberg's and Mr. Rosenblatt's conduct reflects a callous disregard for Jetlev's business partners and customers, as well as a disregard for corporate formalities and obligations.   In doing the acts hereinabove alleged, Jetlev, Mr. Gerszberg and Mr. Rosenblatt acted fraudulently, oppressively, and maliciously and, by reason thereof, Plaintiffs are entitled to exemplary and punitive damages.

127.    The foregoing claims by all Plaintiffs are directed not only to Jetlev, but to Mr. Gerszberg and Mr. Rosenblatt in their personal capacities as alter egos of Jetlev, and to the extent Mr. Gerszberg or Mr. Rosenblatt personally engaged in the conduct alleged.

32

128.   To the extent that any defendant attempts to shift liability to JTI, Mr. Gerszberg and Mr. Rosenblatt should be deemed alter egos of that entity as well for the reasons discussed elsewhere above.

129.   Furthermore, to the extent that Jetlev is defunct and unable to account for its liabilities, JLIP, Aquaflier and JLSG should be held jointly liable for any acts by Jetlev because they are the successors in interest to Jetlev, and/or Jetlev's alter egos.   Mr. Gerszberg is further an alter ego of all these entities, and Mr. Rosenblatt is an alter ego of Aquaflier.

## CLAIM IV – NEGLIGENT MISREPRESENTATION

130.   Plaintiffs hereby incorporate the paragraphs of the Factual Background sections above as if stated fully herein.

131.   This is a claim by Plaintiffs for negligent misrepresentation against Jetlev, as well as against Mr. Gerszberg and Mr. Rosenblatt, and each of them, in their personal capacities.

132.   At a minimum, Jetlev, under the direction of Mr. Gerszberg and Mr. Rosenblatt, negligently represented to Plaintiffs that Jetlev would continue to do business and be able to sell Plaintiffs new jetpacks.   Jetlev knew or should have known that its business was on the verge of effectively shutting down, but was content to keep Jetpack Enterprises' money on the promise that Jetlev was merely experiencing a short term cash crunch and that new jetpack units would be delivered soon.   As such, Defendants' representations were made negligently.

133.   In justifiable reliance on Jetlev's negligent representations, Plaintiffs suspended pursuit of the money that was properly owed to them, and continued to invest time, money and advertising toward the promised launch of the new Jetlev jetpacks.

134.   As a direct and proximate cause of the misconduct herein alleged, Plaintiffs suffered damages of $105,422.80 (plus interest), in addition to costs associated with time, money and effort expended in reliance on Jetlev's promise to provide new equipment, and lost profits when that equipment was not delivered.   Plaintiffs also suffered

33

reputational injury.

135.    Mr. Gerszberg's and Mr. Rosenblatt's conduct reflects a callous disregard for Jetlev's business partners and customers, as well as a disregard for corporate formalities and obligations.  In doing the acts hereinabove alleged, Jetlev, Mr. Gerszberg and Mr. Rosenblatt acted with extreme negligence and, by reason thereof, Plaintiffs are entitled to exemplary and punitive damages.

136.    The foregoing claims by all Plaintiffs are directed not only to Jetlev, but to Mr. Gerszberg and Mr. Rosenblatt in their personal capacities as alter egos of Jetlev, and to the extent Mr. Gerszberg or Mr. Rosenblatt personally engaged in the conduct alleged.

137.    To the extent that any defendant attempts to shift liability to JTI, Mr. Gerszberg and Mr. Rosenblatt should be deemed alter egos of that entity as well for the reasons discussed elsewhere above.

138.    Furthermore, to the extent that Jetlev is defunct and unable to account for its liabilities, JLIP, Aquaflier and JLSG should be held jointly liable for any acts by Jetlev because they are the successors in interest to Jetlev, and/or Jetlev's alter egos.  Mr. Gerszberg is further an alter ego of all these entities, and Mr. Rosenblatt is an alter ego of Aquaflier.

## CLAIM V – INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

139.    Plaintiffs hereby incorporate the paragraphs of the Factual Background sections above as if stated fully herein.

140.    This is a claim by Jetpack Enterprises against Jetlev, Aquaflyer, JLIP, JLSG, Mr. Gerszberg and Mr. Rosenblatt, and each of them, for intentional interference with prospective economic advantage.

141.    In 2011, Jetpack Enterprises had a positive relationship with Mr. Li's Jetlev Technologies, Inc. business.  This relationship allowed Jetpack Enterprises to purchase jetpack equipment from Mr. Li's business, and allowed Jetpack Enterprises to pursue commissioned jetpack sales.  Jetpack Enterprises' relationship with Mr. Li's Jetlev

34

4839-4297-7575.2

Technologies, Inc. business had the potential for a bright future, and thus constituted a valuable prospective economic advantage.

142.    Defendants were aware that Jetpack Enterprises had this prospective economic advantage with Mr. Li's Jetlev Technologies, Inc., yet deliberately set out to wipe the slate clean on that relationship for their own personal gain in the hope of remolding the jetpack industry.

143.    Such acts of interference included at least the following.  Defendants used Jetlev, LLC to take over Mr. Li's pre-existing business.  Instead of honoring the existing relationship with Jetpack Enterprises, Defendants allowed Jetlev to fall behind on its obligations to Jetpack Enterprises.  Defendants then induced Jetpack Enterprises to sign agreements that were either one-sided or fraudulent.  Mr. Gerszberg's JLIP then sued Jetpack Enterprises for patent infringement when Jetpack Enterprises found a new business partner.

144.    As a direct and proximate cause of the Defendants' intentional interference with the original Jetpack Enterprises – Jetlev Technologies, Inc. relationship, Jetpack Enterprises lost a jetpack supplier, lost the possibility of commissioned sales, suffered reputational harm, and lost $105,422.80 along with other money expended in reliance on false promises.

145.    Mr. Gerszberg's and Mr. Rosenblatt's conduct reflects a callous disregard for Jetlev's business partners and customers, as well as a disregard for corporate formalities and obligations.  In doing the acts hereinabove alleged, Defendants acted fraudulently, oppressively, and maliciously and, by reason thereof, Plaintiffs are entitled to exemplary and punitive damages.

146.    The foregoing claims by all Plaintiffs are directed not only to Jetlev, but to Mr. Gerszberg and Mr. Rosenblatt in their personal capacities as alter egos of Jetlev, and to the extent Mr. Gerszberg or Mr. Rosenblatt personally engaged in the conduct alleged.

147.    To the extent that any defendant attempts to shift liability to JTI, Mr. Gerszberg and Mr. Rosenblatt should be deemed alter egos of that entity as well for the

4839-4297-7575.2

reasons discussed elsewhere above.

148.    Furthermore, to the extent that Jetlev is defunct and unable to account for its liabilities, JLIP, Aquaflier and JLSG should be held jointly liable for any acts by Jetlev because they are the successors in interest to Jetlev, and/or Jetlev's alter egos. Mr. Gerszberg is further an alter ego of all these entities, and Mr. Rosenblatt is an alter ego of Aquaflier.

## CLAIM VI – CONVERSION

149.    Plaintiffs hereby incorporate the paragraphs of the Factual Background sections above as if stated fully herein.

150.    This is a claim by Plaintiffs for conversion against Jetlev, as well as against Mr. Gerszberg and Mr. Rosenblatt, and each of them, in their personal capacities.

151.    Jetlev, under the direction of Mr. Gerszberg and Mr. Rosenblatt, wrongfully exercised dominion over Jetpack Enterprises' property – namely, Jetpack Enterprises' money, which is a fixed and readily identifiable sum – by taking that property and applying it to the personal use of the Defendants.

152.    As a direct and proximate cause of the misconduct herein alleged, Plaintiffs suffered damages of $105,422.80 (plus interest), in addition to costs associated with time, money and effort expended in reliance on Jetlev's promise to provide new equipment, and lost profits when that equipment was not delivered. Plaintiffs also suffered reputational injury.

153.    Mr. Gerszberg's and Mr. Rosenblatt's conduct reflects a callous disregard for Jetlev's business partners and customers, as well as a disregard for corporate formalities and obligations. In doing the acts hereinabove alleged, Jetlev, Mr. Gerszberg and Mr. Rosenblatt acted fraudulently, oppressively, and maliciously and, by reason thereof, Plaintiffs are entitled to exemplary and punitive damages.

154.    The foregoing claims by all Plaintiffs are directed not only to Jetlev, but to Mr. Gerszberg and Mr. Rosenblatt in their personal capacities as alter egos of Jetlev, and to the extent Mr. Gerszberg or Mr. Rosenblatt personally engaged in the conduct alleged.

36

155.    To the extent that any defendant attempts to shift liability to JTI, Mr. Gerszberg and Mr. Rosenblatt should be deemed alter egos of that entity as well for the reasons discussed elsewhere above.

156.    Furthermore, to the extent that Jetlev is defunct and unable to account for its liabilities, JLIP, Aquaflier and JLSG should be held jointly liable for any acts by Jetlev because they are the successors in interest to Jetlev, and/or Jetlev's alter egos.  Mr. Gerszberg is further an alter ego of all these entities, and Mr. Rosenblatt is an alter ego of Aquaflier.

## CLAIM VII – NEGLIGENCE

157.    Plaintiffs hereby incorporate the paragraphs of the Factual Background sections above as if stated fully herein.

158.    This is a claim by Plaintiffs for negligence against Jetlev, as well as against Mr. Gerszberg and Mr. Rosenblatt, and each of them, in their personal capacities.

159.    At a minimum, Jetlev, under the direction of Mr. Gerszberg and Mr. Rosenblatt, acted negligently in the management of Jetpack Enterprises' money.  Jetlev, Mr. Gerszberg and Mr. Rosenblatt had a duty to properly apply Jetpack Enterprises' money toward the purchase of equipment, and breached that duty by mismanaging Jetpack Enterprises' funds and not making any provision for their repayment.

160.    Jetlev's breach – and the corresponding breach of Mr. Gerszberg and Mr. Rosenblatt – directly and proximately caused Plaintiffs to lose the $105,422.80 that had been entrusted to Jetlev, as well as to not receive any of the promised equipment.

161.    As a direct and proximate cause of the misconduct herein alleged, Plaintiffs suffered damages of $105,422.80 (plus interest), in addition to costs associated with time, money and effort expended in reliance on Jetlev's promise to provide new equipment, and lost profits when that equipment was not delivered.  Plaintiffs also suffered reputational injury.

162.    Mr. Gerszberg's and Mr. Rosenblatt's conduct reflects a callous disregard for Jetlev's business partners and customers, as well as a disregard for corporate

37

COMPLAINT

formalities and obligations.  In doing the acts hereinabove alleged, Jetlev, Mr. Gerszberg and Mr. Rosenblatt acted with extreme negligence and, by reason thereof, Plaintiffs are entitled to exemplary and punitive damages.

163.    The foregoing claims by all Plaintiffs are directed not only to Jetlev, but to Mr. Gerszberg and Mr. Rosenblatt in their personal capacities as alter egos of Jetlev, and to the extent Mr. Gerszberg or Mr. Rosenblatt personally engaged in the conduct alleged.

164.    To the extent that any defendant attempts to shift liability to JTI, Mr. Gerszberg and Mr. Rosenblatt should be deemed alter egos of that entity as well for the reasons discussed elsewhere above.

165.    Furthermore, to the extent that Jetlev is defunct and unable to account for its liabilities, JLIP, Aquaflier and JLSG should be held jointly liable for any acts by Jetlev because they are the successors in interest to Jetlev, and/or Jetlev's alter egos.  Mr. Gerszberg is further an alter ego of all these entities, and Mr. Rosenblatt is an alter ego of Aquaflier.

## CLAIM VIII - FRAUDULENT CONVEYANCE

166.    Plaintiffs hereby incorporate the paragraphs of the Factual Background sections above as if stated fully herein.

167.    This is a claim by Plaintiffs for fraudulent conveyance against Jetlev and Aquaflier, as well as against Mr. Gerszberg and Mr. Rosenblatt, and each of them, in their personal capacities.

168.    Jetlev had substantial financial obligations to Plaintiffs as a result of having taken their money and having unfulfilled obligations under the Contract.  Jetlev was thus a debtor of the Plaintiffs.

169.    With deliberate intent to avoid paying any compensation to Plaintiffs, Jetlev, under the direction of Mr. Gerszberg and Mr. Rosenblatt, fraudulently transferred assets to Aquaflier.

170.    This fraudulent conveyance directly and proximately caused Plaintiffs to lose the sums of money recited herein.

COMPLAINT

171.    The foregoing conduct reflects a callous disregard for Plaintiffs, as well as a disregard for corporate formalities and obligations.   In doing the acts hereinabove alleged, Jetlev, Aquafler, Mr. Gerszberg and Mr. Rosenblatt acted oppressively, and maliciously and, by reason thereof, Plaintiffs are entitled to exemplary and punitive damages.

172.    To the extent that any defendant attempts to shift liability to JTI, Mr. Gerszberg and Mr. Rosenblatt should be deemed alter egos of that entity as well for the reasons discussed elsewhere above.

173.    Furthermore, to the extent that Jetlev is defunct and unable to account for its liabilities, JLIP, Aquaflier and JLSG should be held jointly liable for any acts by Jetlev because they are the successors in interest to Jetlev, and/or Jetlev's alter egos.   Mr. Gerszberg is further an alter ego of all these entities, and Mr. Rosenblatt is an alter ego of Aquaflier.

## CLAIM IX - BREACH OF FIDUCIARY DUTY

174.    Plaintiffs hereby incorporate the paragraphs of the Factual Background sections above as if stated fully herein.

175.    This is a claim by Plaintiffs for breach of fiduciary duty against Mr. Gerszberg and Mr. Rosenblatt.

176.    Jetlev had substantial financial obligations to Plaintiffs as a result of having taken their money and being in the role (supposedly) of a business partner.   Plaintiffs were thus creditors of Jetlev.

177.    Through the actions of Mr. Gerszberg, and later Mr. Rosenblatt, Jetlev first became dangerously undercapitalized, and then completely insolvent.   Mr. Gerszberg and Mr. Rosenblatt then fraudulently transferred remaining assets of Jetlev to themselves and to their other companies.

178.    Mr. Gerszberg and Mr. Rosenblatt owed a fiduciary duty to Plaintiffs (its creditors) to avoid taking any such actions, yet did they did so deliberately, and without informing Plaintiffs of what was transpiring.   Indeed, Mr. Gerszberg and Mr. Rosenblatt

39

COMPLAINT

gave knowingly false assurances to its creditors that Jetlev was in stable financial condition when it was not, and then later falsely declared that Jetlev had gone bankrupt when it had not.  Mr. Gerszberg and Mr. Rosenblatt thus breached their fiduciary duties to Plaintiffs.

179.   This breach of fiduciary duty directly and proximately caused Plaintiffs to lose the sums of money recited herein, specifically $105,422.80.

180.   The foregoing conduct reflects a callous disregard for Plaintiffs, as well as a disregard for corporate formalities and obligations.  In doing the acts hereinabove alleged, Mr. Gerszberg and Mr. Rosenblatt acted oppressively, and maliciously and, by reason thereof, Plaintiffs are entitled to exemplary and punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs seeks:

   a) judgment that Jetlev materially breached the Contract, and that the other Defendants are jointly liable with Jetlev on Plaintiffs' claims;

   b) judgment that Defendants are liable for fraud, promissory fraud, conversion, intentional interference with prospective business advantage, fraudulent conveyance, and breach of fiduciary duty; or additionally or in the alternative, for negligent misrepresentation and negligence;

   c) rescission of the Contract and full restitution of monies owed to Plaintiffs, which is at least $105,422.80, plus interest;

   d) compensatory damages in an amount sufficient to make Plaintiffs whole;

   e) punitive damages in an amount commensurate with Defendants' misconduct and to dissuade further misconduct, but in no event less than $1,000,000.00;

   f) an award of Plaintiffs' attorneys fees and costs in this action;

   g) pre- and post-judgment interest; and

   h) such other and further relief as the Court may deem just and equitable.

40

Dated:  December 18, 2015 **FOLEY & LARDNER LLP**

By:  */s/ Jean-Paul Ciardullo*
     Jean-Paul Ciardullo

Attorneys for Plaintiffs
Jetpack Enterprises, LCC and
Jetpack Enterprises – San Diego, LLC

41

COMPLAINT

## **DEMAND FOR JURY TRIAL**

Jetpack Enterprises, LCC and Jetpack Enterprises – San Diego, LLC hereby demand a trial by jury of all issues triable by a jury.

Dated:  December 18, 2015                          **FOLEY & LARDNER LLP**

By: *_/s/ Jean-Paul Ciardullo_____*
Jean-Paul Ciardullo

Attorneys for Plaintiffs
Jetpack Enterprises, LCC and
Jetpack Enterprises – San Diego, LLC

42

4839-4297-7575.2