William J. Robinson (CA Bar No. 83729)
email: wrobinson@foley.com
Jean-Paul Ciardullo (CA Bar No. 284170)
email: jciardullo@foley.com
**FOLEY & LARDNER LLP**
555 South Flower Street, Suite 3500
Los Angeles, CA 90071-2411
Telephone: 213.972.4500
Facsimile: 213.486.0065

Attorneys for Plaintiffs
JETPACK ENTERPRISES, LLC and
JETPACK ENTERPRISES – SAN DIEGO, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| JETPACK ENTERPRISES, LLC, a California Company, and JETPACK ENTERPRISES – SAN DIEGO, LLC., a California Company,<br><br>*Plaintiffs*,<br><br>v.<br><br>JETLEV, LLC, a Delaware Company, JETLEV TECHNOLOGIES, Inc., a Florida Company, JLIP, LLC, a Delaware Company, AQUAFLIER, LLC, a Florida Company, JLSG, LLC, a New Jersey Company, SETH GERSZBERG, an Individual, and MATTHEW ROSENBLATT, an Individual,<br><br>*Defendants*. | Case No: 8:15-cv-02113-CJC-JCG<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>DATE: April 25, 2016<br>TIME: 1:30 p.m.<br>CTRM: 9B |

4810-6094-8015.2

# Table of Contents

I.      INTRODUCTION .......................................................................................1

II.     APPLICABLE LAW REGARDING SPECIFIC JURISDICTION......................2

III.    THE UNCONTROVERTED ALLEGATIONS OF THE COMPLAINT
        (WHICH MUST BE TAKEN AS TRUE).................................................3

        A.      Plaintiffs' And Defendants' Multi-Year Relationship ...................4

        B.      The JLIP Agreement ...........................................................6

        C.      The San Diego Agreement ....................................................7

        D.      The November 2013 Contract ................................................8

        E.      Defendants' Breach Of The November 2013 Contract And Torts
                Related Thereto ..............................................................9

IV.     ARGUMENT........................................................................11

        A.      Jetlev Is Subject To Specific Jurisdiction ................................11

                1.      The November 2013 Contract Targeted California And Had No
                        Forum Selection Clause ..........................................11

                2.      Defendants Also Interfered With The California-based
                        Relationship Between JTI And Jetpack Enterprises..........14

        B.      The Other Defendants Are Subject To Jurisdiction Because Plaintiffs
                Have Properly Pled That They Are Alter Egos Of Jetlev And/Or Have
                Individual Or Successor Liability ...........................................14

                1.      Messrs. Gerszberg And Rosenblatt Have Been Accused Of
                        Both Individual And Alter Ego Liability.......................14

                2.      JLIP And JLSG Are Accused Of Both Alter Ego And
                        Successor Liability................................................16

        C.      Transfer To Florida Is Not "In The Interests Of Justice" ...............18

                1.      This Is A California Case About California Injuries ..........18

                2.      JLIP, JLSG And Mr. Gerszberg Are Not Even Florida Entities........19

                3.      Plaintiffs' Claims Are Different From Those Of The Other
                        Claimants .......................................................19

                4.      Transfer Would Not Create Any Judicial Efficiency .........20

                5.      All Factors Weigh Against Transfer.............................20

V.      CONCLUSION.....................................................................22

4810-6094-8015.2

## I.  __INTRODUCTION__

Plaintiffs Jetpack Enterprises, LLC ("Jetpack Enterprises") and Jetpack Enterprises – San Diego, LLC ("Jetpack Enterprises – San Diego"), hereby oppose the Motion to Dismiss (Dkt. 21, "Motion") brought by defendants Jetlev LLC ("Jetlev"), JLIP LLC, JLSG LLC, Seth Gerszberg and Matt Rosenblatt (collectively "Defendants").

This case concerns the sport of water-propelled jetpacking (also called "hydroflight"), which has grown in popularity in the past several years.  Plaintiffs operate well-known commercial jetpack rental centers in Newport Beach and San Diego, and also sell jetpacks to consumers.  Defendant Jetlev and its predecessor, Jetlev Technologies, Inc. ("JTI"),[1] contracted to sell jetpack equipment to Plaintiffs for Plaintiffs' rental operations (which used the name "Jetlev Southwest" at the time), and also paid commissions to Plaintiffs on Plaintiffs' sales of Jetlev-brand equipment.  Defendants JLIP and JLSG are Jetlev's sister companies, and Messrs. Gerszberg and Rosenblatt are owners/managers of the corporate Defendants.

Amazingly absent from Defendants' Motion is any meaningful acknowledgement of the November 2013 Contract between Jetlev and Plaintiffs that was the centerpiece of Plaintiffs' Complaint, or of the various other agreements between Plaintiffs and Jetlev that gave rise to that contract, such as the 2013 San Diego Exclusivity Agreement ("San Diego Agreement").  It is these agreements, and the conduct relating thereto, that make jurisdiction in California over Jetlev (and its managers) just and proper under the California Long Arm Statute.  Jurisdiction over the other defendants is also proper under the doctrines of alter ego liability and successor liability.  Importantly, none of the aforementioned agreements between Plaintiffs and Jetlev contain forum selection clauses.  Furthermore, the present dispute does not arise from Defendants' cited license agreement

---

[1] JTI is a "paper only" entity that was otherwise fully absorbed by Jetlev.  It was only just served with the Complaint and its response is not yet due.  JTI is not represented by Defendants' counsel.  The remaining defendant, Aquaflier LLC, was served (Dkt. 23), but Defendants have taken the position that they will not defend Aquaflier because it is a dissolved entity.  Plaintiffs will take up that issue separately.

1

with JLIP, so that agreement's forum selection clause is irrelevant.

It is entirely fair and just to call Messrs. Gerszberg and Rosenblatt to California to answer for their intentional acts committed through their corporate entities that they knew would injure Plaintiffs and Plaintiffs' business operations in California. Nor does the existence of other actions brought by other entities in Florida State Court require a different result. Here, Plaintiffs' claims arise out of agreements and relationships between Plaintiffs and Defendants that are unique and distinct from the agreements and relationships at issue in the Florida State Court actions, so the cases can be decided entirely independently. Plaintiffs had a unique, long-running history with Defendants that sets them apart from the other aggrieved parties. Fundamentally, this case concerns injuries to California entities, intentionally caused by defendants who knew they were directing their actions to California, and who had sought to take advantage of the California market through Plaintiffs.

## II.   APPLICABLE LAW REGARDING SPECIFIC JURISDICTION

Plaintiffs here argue that Defendants are properly subject to specific jurisdiction in California. The Ninth Circuit applies a three-prong test for analyzing a claim of specific personal jurisdiction: (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable. *Id.* With respect to "purposeful availment," the showing typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there. *Id.* Regarding "purposeful direction," the Ninth Circuit

2

applies the three-part *Calder* "effects" test, which looks to whether the defendant (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. *Id.* at 804.

Defendants' Motion relies heavily on the Supreme Court's ruling in *Walden v. Fiore*, 134 S. Ct. 1115 (2014), which, as shown further below, is factually very distinct from the present case.  In *Walden*, a Georgia law enforcement official had been sued in Nevada because he had confiscated money from a Nevada resident who happened to be passing through a Georgia airport.  On those facts, the Supreme Court explained that personal jurisdiction could not be had based on a defendant's "random, fortuitous, or attenuated contacts" or on the "unilateral activity" of a plaintiff.  *Id.* at 1123.  Instead, the Supreme Court explained that "the relationship must arise out of contacts that the defendant *himself* creates with the forum State."  *Id.* at 1122.  The Supreme Court elaborated that "[a]ccordingly, we have upheld the assertion of jurisdiction over defendants who have purposefully reached out beyond their State and into another by, for example, entering a contractual relationship that envisioned continuing and wide-reaching contacts in the forum State."  *Id*. (citations omitted.)  Thus, *Walden* stands for the unsurprising proposition that a plaintiff cannot unilaterally manufacture minimum contacts with a forum through some random contact.  Instead, the defendant must have taken some deliberate action directed to the forum, and the cause of action must arise from that conduct.  As shown below, that is precisely what happened here.  In fact, this is a textbook case of specific personal jurisdiction.

## III.   THE UNCONTROVERTED ALLEGATIONS OF THE COMPLAINT (WHICH MUST BE TAKEN AS TRUE)

It is well-established that the uncontroverted allegations of the complaint must be taken as true when assessing personal jurisdiction, and that to the extent there is any factual dispute arising from affidavits, it must be resolved in favor of the non-movant. *Dole Food Co. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002).   Here, defendants Gerszberg and Rosenblatt filed affidavits with their Motion (Dkts. 21-1, 21-2) attesting

3

essentially to the facts that: (1) they personally do not own property, own businesses, etc. in California, (2) their companies are not based in California and do not currently derive substantial revenue from California.  But Plaintiffs do not contest these points (at least so far as they go for purposes of this Motion).   Instead, as shown herein, personal jurisdiction arises out of the November 2013 Contract, the agreements that led to it, and the conduct related to those agreements.  Plaintiffs will note, however, that the affidavits incorrectly deny certain important facts that will be discussed below, including the fact that Jetlev did in fact have an employee in Los Angeles, and that Mr. Rosenblatt did in fact meet face-to-face with Plaintiffs' President.  The following is a brief overview of the background facts of this case, which are laid out in greater detail Plaintiffs' exhaustive 43-page Complaint.  Facts below are also supported by the concurrently-filed Declaration of Plaintiffs' President, Mr. Dean O'Malley ("O'Malley Dec.").

### A.   Plaintiffs' And Defendants' Multi-Year Relationship

Plaintiffs' hydroflight business began in 2011 with the purchase by plaintiff Jetpack Enterprises of a number of jetpack units for several hundred thousand dollars from Jetlev Technologies Inc., a company run by Raymond Li, who is credited as being the inventor of hydroflight technology.   (O'Malley Dec. ¶ 3; Complaint ¶¶ 14-18.) Jetpack Enterprises was the first and largest commercial rental operator of Jetlev-brand jetpacks, giving it an important place in Jetlev's company history.  At the time, Jetpack Enterprises went by the name "Jetlev Southwest."  (O'Malley Dec. ¶ 3; Complaint ¶¶ 76-77.)  Mr. Li wanted Jetpack Enterprises to be the first of his intended "dealerships" for Jetlev jetpack sales, and so JTI also entered into an agreement with Jetpack Enterprises whereby it promised to pay Jetpack Enterprises a 15% commission on sales of Jetlev-brand jetpacks brokered by Jetpack Enterprises ("**Commission Agreement**").  (O'Malley Dec. ¶ 6; Complaint ¶ 77.)  Jetlev in fact paid Jetpack Enterprises its 15% commission on sales that Jetpack Enterprises brokered with customers in the Cayman Islands in 2012, cementing the deal.  (*Id*.)

Notably, although Mr. Gerszberg's affidavit submitted with the Motion states that

4

"Jetlev has never placed any employees…in California" (Dkt. 21-1, ¶ 4), Jetlev's VP of Marketing, Ralphie Aronowitz, lived and worked in Los Angeles.  (O'Malley Dec. ¶ 8.) Mr. Aronowitz had connections to the Hollywood community and spoke with Plaintiffs' President on several occasions about plans to have Hollywood celebrities go to Newport Beach to ride Jetpack Enterprises' Jetlev-brand jetpacks as part of a marketing campaign. (*Id.*)  So, clearly, Jetlev had reached out to this District and had an employee here to advance its interests in California.[2]

Mr. Gerszberg became involved with Jetlev in late 2011, orchestrating the takeover of JTI and the transfer of all of its assets, operating liabilities, accounts payable, and dealer agreements to Jetlev LLC via a Joint Venture Agreement ("JVA") dated January 1, 2012.  (Complaint ¶¶ 19-40; *see* JVA at Dkt. 1-1, Page 1, section entitled "*Newco Initial Capital Contributions of JTI*".)  Thus, through the JVA, JTI was fully absorbed by Jetlev – JTI essentially "became" Jetlev.   Simultaneously, Mr. Gerszberg orchestrated the creation of a "trademark holding company" called JLIP LLC.  (*See* JVA, Intro and section entitled "*Intellectual Property*.")   Mr. Gerszberg also simultaneously created JLSG LLC to act as an investment vehicle to fund Jetlev and JLIP.  (JLSG presumably stands for "Jetlev Seth Gerszberg" and is aptly referred to simply as "Seth" in the JVA (*see Intro definitions*), only underscoring its alter ego status.)   Plaintiffs' Complaint alleges that Mr. Gerszberg engaged in a hostile takeover, and then proceeded to operate the companies exclusively at his own whim, cutting out Mr. Li in violation of the JVA, and using the company to perpetuate various frauds and misconduct alleged in the pleadings. (Complaint ¶¶ 19-73.)  The Complaint further alleges that Mr. Rosenblatt was Mr. Gerszberg's confidante who participated in the complained-of activities starting at least in July 2013, acting as Mr. Gerszberg's proxy.  Mr. Rosenblatt is even directly quoted as saying that he and Mr. Gerszberg are "one in [*sic*] the same."  (*Id.* ¶ 53.)

---

[2] An article identifying Mr. Aronowitz as Jetlev's VP of Marketing can be found here: http://www.yachtingmagazine.com/behold-flying-yachtsman.

5

### B.    The JLIP Agreement

Defendants make much of the January 2013 license agreement between Jetpack Enterprises and the trademark holding company, JLIP ("JLIP Agreement," Exhibit A to Dkt. 21-1).  However, this agreement has little (if anything) to do with the claims in this action, and is certainly not relevant to personal jurisdiction and venue.  First, it must be noted that the JLIP Agreement is with <u>JLIP only</u> – no other Defendant is a party to it, in spite of Defendants' hand-waving attempt to make it seem as though this agreement governed all the parties.  Second, the forum-selection clause of the JLIP Agreement (Section 23.C) applies only to actions "*arising out of and/or related to this Agreement*." Here, however, Plaintiffs' claims do not "arise out of and/or relate to" the JLIP Agreement, whose subject matter is wholly unrelated to the present lawsuit.

The JLIP Agreement was a one-sided *trademark licensing deal* whose un-stated but principal objective was to insulate Mr. Gerszberg from liability stemming from any *personal injury actions* arising at Jetpack Enterprises (*see, e.g.*, JLIP Agreement page 6 and Exhibit B, Liability Waiver).  Essentially, the JLIP Agreement gave Jetpack Enterprises the right to use certain limited Jetlev branding that was claimed to be trademarked by JLIP,[3] and in return Jetpack Enterprises agreed to maintain certain safety measures, and to provide full indemnification for personal injury actions.  The term of the agreement was one year, and then it expired.[4]

---

[3] The JLIP Agreement did not even confer rights to use the name "JETLEV," and Jetpack Enterprises dropped its former name "Jetlev Southwest" in favor of "Jetpack America" shortly after signing the agreement anyway.  (O'Malley Dec. ¶ 10.)  Jetpack Enterprises (which was unrepresented at the time) was taken advantage of by JLIP in this one-sided deal.  (*Id*.)

[4] It should be noted that the JLIP Agreement does contain one section (Section 11) offering payment of a 2.5% finder's fee to Jetpack Enterprises if Jetpack Enterprises were to ever refer a customer to JLIP who then bought a jetpack.  However, this 2.5% finder's fee provision is entirely separate and distinct from the pre-existing 15% Commission Agreement between Jetpack Enterprises and *Jetlev* governing sales that Jetpack Enterprises arranged and brokered on its own with its own customers, as had been done with the Cayman customers.  (O'Malley Dec. ¶ 10.)  Indeed, as shown below, Jetlev expressly acknowledged in the November 2013 Contract that it owed Jetpack Enterprises the 15% commission under the Commission Agreement.  Thus, the 2.5% finder's fee provision of the JLIP Agreement is utterly irrelevant to this lawsuit, and none of

6

In sum, while the short-lived JLIP Agreement provides interesting context with respect to a *trademark licensing and personal injury* deal as between Jetpack Enterprises and *JLIP*, is not relevant to personal jurisdiction or venue in this action, which concerns *breach of the November 2013 Contract and business torts flowing therefrom* committed by *Jetlev* and its managers.  JLIP has only been included as a defendant in this action to the extent it has successor liability for Jetlev's accused conduct, which is wholly unrelated to the JLIP Agreement.

### C.    The San Diego Agreement

The San Diego Agreement (attached here as **Exhibit A** to the O'Malley Declaration) is conspicuously not mentioned anywhere in Defendants' Motion, even though it is of central importance, and was featured prominently in the Complaint. (Complaint ¶¶ 82, 87.)  This February 2013 Agreement[5] was executed between Jetpack Enterprises and defendant *Jetlev*, and contemplated that Jetpack Enterprises would pay Jetlev a fully refundable $85,000 deposit toward the optional future purchase of four Jetlev jetpacks for use at a new San Diego facility.  In return, Jetlev was to provide exclusivity in the San Diego region, clearly contemplating that Jetlev would continue selling more units to Plaintiffs and expand its California-derived revenue.  Jetpack Enterprises paid Jetlev $85,000 under the San Diego Agreement, and formed Jetpack Enterprises–San Diego in March 2013 to begin rental operations in San Diego. (O'Malley Dec. ¶ 11.)  However, Jetpack Enterprises gave its pre-existing jetpacks to Jetpack Enterprises–San Diego, and exercised its option to not purchase any jetpacks under the San Diego Agreement.  (*Id*.)

Notably, the San Diego Agreement contains no forum selection clause.  No purchase orders were ever executed with respect to the San Diego Agreement because

---

Plaintiffs claims "arise from or relate to" the finder's fee provision.

[5] Note that Mr. Gerszberg's brother-in-law, Benjamin White, incorrectly dated the signature line "2014" – the actual date of the agreement was February 2013.

4810-6094-8015.2

Jetpack Enterprises never ended up buying any of the contemplated jetpacks (O'Malley Dec. ¶ 11), and Defendants concede generally that they "have been unable to locate [purchase orders] related to Plaintiffs in this case." (Motion at 11.)

### D.    The November 2013 Contract

By August 2013, Jetpack Enterprises wanted to settle a number of outstanding issues with Jetlev. First and foremost, Jetpack Enterprises demanded the return of its refundable $85,000 deposit under the San Diego Agreement, having decided it no longer wanted to pursue that deal. (Complaint ¶¶ 86-90; O'Malley Dec. ¶ 12.) Jetpack Enterprises was also owed an $18,000 commission on its Singapore sales pursuant to its Commission Agreement with Jetlev, which had already previously been honored and affirmed on past occasions. (*Id.*) Finally, Jetpack Enterprises asserted that it was owed $2,415 to cover the purchase price of certain helmets that it argued Jetlev had failed to deliver from back in 2011.[6] (O'Malley Dec. ¶ 5.) Notably, none of the agreements at issue contained forum selection clauses.

Jetlev corresponded with Plaintiffs in California extensively regarding these issues to negotiate a solution. (Complaint ¶¶ 89-90; O'Malley Dec. ¶ 12-13; Rosenblatt Dec. (Dkt. 21-2) ¶ 4.) Jetlev ultimately agreed that, in lieu of paying the money owed, it would credit the money towards several new jetpack products called AquaFlyers and AquaBoards, which would be delivered to Plaintiffs in California, in furtherance of an ongoing relationship between the companies. (*Id.*) Notably, the November 2013 Contract confirms that Jetlev indeed did owe the amounts claimed by Plaintiffs.[7]

---

[6] Note that the JLIP Agreement included a safety requirement that Jetpack Enterprises use helmets in their rental operation. However, the four helmets at issue here were part of a transaction with *Jetlev* (not JLIP) that *pre-dated* the 2013 JLIP Agreement. Furthermore, the JLIP Agreement only required the use of helmets, and did not govern their procurement. For all these reasons, the after-occurring JLIP Agreement had nothing to do with the $2,415 disputed helmet transaction.

[7] This included the $18,000 in commissions, which reflected 15% of the Singapore sales that Jetpack Enterprises had brokered, thereby confirming both that the Commission Agreement was enforceable, and that it was distinct from the 2.5% finder's fee that was later referenced in the after-occurring JLIP Agreement.

Furthermore, the JLIP Agreement cited in Defendants' Motion is referenced *nowhere* in the November 2013 Contract, because it had nothing to do with it.

The understanding between the parties under the November 2013 Agreement was that the new AquaFlyer and AquaBoard units would start being delivered before the end of 2013, and the agreement required Jetlev to provide parts and services at 50% off until the final unit had been delivered, clearly contemplating an ongoing business relationship in California.  (*Id*.)  The November 2013 Contract was signed by Mr. Rosenblatt on behalf of Jetlev, and Dean O'Malley as President of Jetpack America (Plaintiffs' brand).  (*Id*.)  Contrary to Mr. Rosenblatt's assertion in the affidavit he submitted with the Motion that "I do not recall ever meeting with any corporate representative of Plaintiff" (Dkt. 21-2 ¶ 4), Mr. Rosenblatt signed the November 2013 Contract in person with Mr. O'Malley. (O/Malley Dec. ¶ 12.)  It is odd that Mr. Rosenblatt would not remember this, especially after having been reminded of it in the Complaint.

It is the November 2013 Contract that was the primary focus of Plaintiffs' Complaint and that is the primary basis for the exercise of personal jurisdiction, yet Defendants' Motion effectively pretends that it does not exist.   Importantly, the November 2013 Contract contains no forum selection clause.

### E.   Defendants' Breach Of The November 2013 Contract And Torts Related Thereto

When the AquaFlyer and AquaBoard units had not been delivered by April 2014, Mr. O'Malley informed Mr. Rosenblatt that he was travelling to meet him at Jetlev to discuss.   Upon Mr. O'Malley's arrival, however, Mr. Rosenblatt refused to meet him face-to-face, and instead called him from a remote location to say that Jetlev was bankrupt, that the November 2013 Contract would not be honored, and that Plaintiffs' money would not returned.  (Complaint ¶¶ 92-95; O'Malley Dec. ¶ 15-16.)  Amazingly, Mr. Rosenblatt offered to sell Mr. O'Malley additional AquaFlyer and AquaBoard units from his new company, Aquaflier, *i.e*., which would force Plaintiffs to have to pay for them all over again.   (*Id*.)   As alleged in the Complaint, Jetlev's assets had been

9

fraudulently conveyed to Aquaflier by the Defendants.  (Complaint ¶¶ 57-59.)  Aquaflier simply took up residence at Jetlev's address, absorbed Jetlev's assets and none of the debt, and changed the sign on the door.   (*Id.*)   In reliance on Mr. Rosenblatt's representations, Plaintiffs believed that Jetlev was bankrupt, and so abandoned their claims.  (Complaint ¶ 94-95; O'Malley Dec. ¶ 16.)   The harms from all the various alleged misconduct were felt by Plaintiffs in California – as Defendants knew they would be – in the form of loss of Plaintiffs' $105,422.80, as well as lost income from jetpack sales and rentals in California that would have occurred if Plaintiffs had received the promised units.  (O'Malley Dec. ¶ 16.)

Plaintiffs ultimately found a new jetpack supplier in Stratospheric Industries, which manufactures a product called the X-Jetpack.  The next that Plaintiffs heard from Defendants, JLIP had filed a patent infringement lawsuit against them in Florida in August 2014 without any warning, alleging infringement via Jetpack Enterprises' sales of X-Jetpacks.[8]  (*Id.*)  It was not until Plaintiffs retained counsel to defend that suit that they learned that Jetlev had never, in fact, gone bankrupt.  (O'Malley Dec. ¶ 18.)  Plaintiffs were dismissed from the Florida patent suit for lack of personal jurisdiction because Plaintiffs had never sold any of the allegedly infringing X-Jetpacks in Florida, and thus had no ties to the forum that pertained to the accused conduct.[9]  (*Id*. ¶ 17.)  Although Defendants cite this dismissal as if it somehow supports their Motion, it is in fact completely consistent with the result that should be obtained in this case.  Specifically, as shown above and discussed further below, Plaintiffs' injuries *arose from Defendants' relevant contacts with the forum*, so specific jurisdiction in California is proper.

---

[8] Plaintiffs later learned that JLIP is 50/50 owned by Raymond Li, but Mr. Gerszberg never consulted Mr. Li to obtain approval to file the lawsuit, as required would have been required pursuant to Delaware Code §18-402.  JLIP thus lacked standing to sue.

[9] The Florida JLIP patent lawsuit was later stayed pending a reexamination of the asserted patent.  Although the reexamination has concluded, the defendants in the patent case have moved for dismissal on grounds that (1) the patent was substantively amended in the reexamination to escape invalidation, and (2) JLIP never had standing given that Mr. Li never approved of the lawsuit.

4810-6094-8015.2

## IV.  ARGUMENT

### A.  Jetlev Is Subject To Specific Jurisdiction

#### 1.  The November 2013 Contract Targeted California And Had No Forum Selection Clause

Claims I-IV and VI-IX of Plaintiffs' Complaint all arise out of and relate to the November 2013 Contract with Jetlev, and Defendants' misconduct flowing therefrom that led to the loss of the $105,422.80, and consequential damages.  The November 2013 Contract was only the most recent of an ongoing series of contacts between Jetlev and Jetpack Enterprises that reflected clear purposeful availment of, and purposeful direction towards, California with the goal of deriving substantial revenue from California into the future.  As mentioned, the November 2013 Contract had no forum selection clause that would compel jurisdiction anywhere else.

With respect to Claim I for Breach of Contract, specific personal jurisdiction exists over Jetlev because the November 2013 Contract contemplates the sale and delivery of over $100,000 worth of equipment into California for the purpose of simultaneously erasing a debt owed in California and perpetuating what had been an ongoing relationship between Jetlev and Jetpack Enterprises in California to exploit the California market.  The November 2013 Contract also specifically contemplates the ongoing provision of parts and services by Jetlev in California.  Jetpack Enterprises had clearly been a source of significant revenue for Jetlev, and Jetlev sought to exploit that relationship going forward, hoping to sell more jetpacks to Plaintiffs and foster future business.

The November 2013 Contract itself arose from a series of other agreements and business dealings that tie defendant Jetlev to California, and show that Jetlev hoped to expand its presence in the California market through Plaintiffs.  First among these was the San Diego Agreement, which reflected a clear intent by Jetlev to secure Jetpack Enterprises (and ultimately Jetpack Enterprises–San Diego) as long-term business partners in the Southern California region.  Jetlev was in fact offering Plaintiffs *exclusivity* in that region, and clearly contemplating that it would be selling jetpacks to

11

4810-6094-8015.2

Plaintiffs to support those operations.   Jetlev had no trouble taking (and ultimately keeping) Plaintiffs' $85,000 for this purpose.   By executing the San Diego Agreement, Jetlev and its managers were unambiguously reaching out to and availing themselves of California, and planned to sell jetpacks to Plaintiffs there well into the future.   Similarly, the $18,000 in unpaid commissions under the Commission Agreement, and the $2,415 that had been owed by Jetlev since 2011, are themselves separate contacts with California that would have individually given rise to personal jurisdiction.[10]   Essentially, the November 2013 Contract was the capstone on what had already been a long series of contacts between Jetlev and California in which Jetlev sought to exploit the California market through Plaintiffs.   The fact that Jetlev had a Marketing VP in Los Angeles who sought to bring Hollywood celebrities to Jetpack Enterprises' place of business further demonstrates Jetlev's long-standing interest in the California market, and confirms the fairness of calling Jetlev to this District to answer the Complaint.

The foregoing facts – reaching out to contract with a California business to supply significant amounts of equipment in California, to erase a substantial debt owed in California, and to perpetuate into the future what had already been a multi-year business relationship to capitalize on the California market – all satisfy the requirements of specific personal jurisdiction.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-476 (1985) ("where the defendant deliberately has  engaged in significant activities within a State [] or has created continuing obligations between himself and residents of the forum [] he manifestly has availed himself of the privilege of conducting business there, and…it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum") (citations omitted); *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 381 (9th Cir. 1990) ("This circuit has held that a non-resident defendant's act of soliciting business

---

[10] With respect to the Commission Agreement, although it was technically entered into by JTI before the existence of Jetlev, Jetlev expressly inherited that agreement under the JVA, and in so doing, inherited the contacts with California that came with it.   *See* JVA, page 1; *see also* Section IV.B.2 regarding successor liability.

4810-6094-8015.2

in the forum state will generally be considered purposeful availment if that solicitation results in contract negotiations or the transaction of business."); *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1210 (9th Cir. 2006) ("A single forum state contact can support jurisdiction if the cause of action…arises out of that particular purposeful contact of the defendant with the forum state.") (citations omitted); *ViX Swimwear, Inc. v. SBC Clothing, Inc.*, No. 14-1113, 2015 U.S. Dist. LEXIS 82793, *10-14 (S.D. Cal. June 24, 2015) (finding personal jurisdiction based on contractual agreement and history of transactions between the parties).

With respect to Claims II-IV and VI-IX for fraud, negligence, conversion and breach of fiduciary duty, specific personal jurisdiction is proper for much the same reason as it is proper with respect to Claim I because each of these claims is based on the same basic facts that led to the breach of contract.  Specifically, under the allegations of the well-pleaded Complaint, Jetlev and its managers were acutely aware that their fraud, negligence, conversion and breach of fiduciary duty with respect to the money that Plaintiffs had entrusted under the November 2013 Contract would injure Plaintiffs in California, but Jetlev and its managers deliberately proceeded with their conduct in spite of that knowledge.  The complained-of torts also arose from the same ongoing series of business dealings between Jetlev and California that gave rise to the November 2013 Contract.  Fundamentally, the tort claims are about Jetlev knowingly taking money from and misleading a long-time business partner in California with respect to anticipated future business in California, fully aware that the injury would be felt in California.  All of the foregoing satisfies personal jurisdiction with respect to Claims II-IV and VI-IX. *Dole Food Co. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002) (finding with respect to tort claims that "when a forum in which a plaintiff corporation has its principal place of business is in the same forum toward which defendants expressly aim their acts, the 'effects' test permits that forum to exercise personal jurisdiction"); *Haake v. Strudwick*, No. 14-212, 2014 U.S. Dist. LEXIS 168749, *18-23 (D. Idaho Dec. 1, 2014) (exercising personal jurisdiction over claims for torts directed to forum residents even where

13

defendant had not visited the forum).

Furthermore, the Court would have full discretion to hear the tort claims alongside the breach of contract claim under the doctrine of pendant personal jurisdiction. *Action Embroidery Corp. v. Atl. Embroidery, Inc.,* 368 F.3d 1174, 1180 (9th Cir. 2004) ("a court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction").

### 2. Defendants Also Interfered With The California-based Relationship Between JTI And Jetpack Enterprises

Claim V for Intentional Interference with Prospective Business Advantage stands somewhat alone in that it is the only Claim that does not pertain to the November 2013 Contract. However, the Court has jurisdiction over this claim for two reasons. First, the alleged tortious interference was directed to a California-based relationship between JTI and Jetlev, and thus knowingly caused injury that would be felt in California, subjecting Jetlev to personal jurisdiction there. *See Tresóna Multimedia LLC v. Legg*, 2015 U.S. Dist. LEXIS 13179, *7-12 (D. Ariz. Feb. 4, 2015) (upholding personal jurisdiction over an intentional interference claim against an out-of-state defendant). Second, the Court would also have broad discretion to hear the tortious interference claim (or any other claim, for that matter) under the doctrine of pendant personal jurisdiction. *Action Embroidery,* 368 F.3d at 1180.

### B. The Other Defendants Are Subject To Jurisdiction Because Plaintiffs Have Properly Pled That They Are Alter Egos Of Jetlev And/Or Have Individual Or Successor Liability

### 1. Messrs. Gerszberg And Rosenblatt Have Been Accused Of Both Individual And Alter Ego Liability

With respect to Claims II-IX, Messrs. Gerszberg and Rosenblatt are accused of individual liability for tortious acts that they personally committed. The corporate form

14

does not insulate Messrs. Gerszberg and Rosenblatt from accused individual tortious acts, and personal jurisdiction is proper over them for all the same reasons it is proper over Jetlev on those claims. *People v. Pacific Landmark, LLC*, 129 Cal. App. 4th 1203, 1215 (2005) ("although officers cannot be held liable solely by virtue of their corporate title, they can and are held personally liable for actively participating in [] tortious conduct.").

Additionally and alternatively, Messrs. Gerszberg and Rosenblatt have been accused of alter ego liability with respect to all of Claims I-IX.  A well-pleaded claim of alter-ego liability subjects a corporate manager to personal jurisdiction where his or her company would otherwise be subject to personal jurisdiction. *Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1393 (9th Cir. 1984) ("Where a corporation is the alter ego of the stockholders so as to justify disregard of the corporate entity[,] jurisdiction over the corporation will support jurisdiction over the stockholders.") (citing *Sheard v. Superior Court*, 40 Cal. App. 3d 207, 210, 114 Cal. Rptr. 743 (1974)).

Here, Plaintiffs' Compliant presents a textbook case of proper alter-ego pleading, and thus amply supports the exercise of personal jurisdiction over Messrs. Gerszberg and Rosenblatt.  Under California law, when assessing whether there is unity of interest between a corporation and an individual for the purposes of piercing the corporate veil under alter ego liability, courts consider, among other factors: the commingling of funds and other assets; the failure to segregate funds of the individual and the corporation; the unauthorized diversion of corporate funds to other than corporate purposes; the treatment by an individual of corporate assets as his own; the failure to seek authority to issue stock or issue stock under existing authorization; the failure to maintain adequate corporate minutes or records; the intermingling of the individual and corporate records; the ownership of all the stock by a single individual or family; the domination or control of the corporation by the stockholders; the use of a single address for the individual and the corporation; the inadequacy of the corporation's capitalization; the use of the corporation as a mere conduit for an individual's business; the concealment of the ownership of the corporation; the disregard of formalities and the failure to maintain arm's-length

15

transactions with the corporation; and the attempts to segregate liabilities to the corporation. *Johnson v. Serenity Transp., Inc.*, 2015 U.S. Dist. LEXIS 148384, *15-16 (N.D. Cal. Nov. 2, 2015) (collecting cases). Courts have held that a plaintiff need only plead two or three of these factors to adequately plead unity of interest. *Id.*

Plaintiffs' Complaint easily meets this pleading standard. Plaintiffs' allegations (*see, e.g.*, Complaint ¶¶ 65-73) are that Mr. Gerszberg ignored the corporate form and the requirements of the JVA, and instead ran Jetlev at his own whim without regard for corporate formalities or bookkeeping. The allegations are that Jetlev was deliberately undercapitalized, that the JVA was breached, Mr. Li was cut out of decision-making, Mr. Gerszberg controlled all decision-making at the company (whether directly or by feeding instructions to his well-paid brother-in-law), and that Mr. Gerszberg used Jetlev to engage in various acts of fraud. Mr. Rosenblatt is alleged to have joined Mr. Gerszberg in taking these actions, serving as his proxy and acting in direct coordination with him starting in mid-2013. Plaintiffs' Compliant alleges that it would sanction fraud and promote injustice to allow Messrs. Gerszberg and Rosenblatt to hide behind the corporate veil, and indeed it would. It is hard to imagine what more Plaintiffs could possibly have alleged to make out a case for alter ego liability. Thus, personal jurisdiction is proper over Messrs. Gerszberg and Rosenblatt for all the same reasons it is proper over Jetlev.

## 2.  JLIP And JLSG Are Accused Of Both Alter Ego And Successor Liability

Plaintiffs' Complaint alleges that JLIP and JLSG should be deemed to have alter ego and/or successor liability to the extent that Jetlev cannot satisfy a judgment and effectively ceases to exist. (Complaint ¶¶ 23-24, 27, 67, 71-75.) Alter ego liability has been discussed above; essentially, Plaintiffs argue that there was a complete unity of interest (and indeed, a total identity of employees) among Jetlev, JLSG and JLIP; and no proper division of accounts such that money and resources freely flowed among them as if they were one company, and that adhering to a notion of corporate separateness would sanction fraud and promote injustice. *Johnson*, 2015 U.S. Dist. LEXIS 148384 at *15-16

4810-6094-8015.2

16.

Furthermore, the Complaint also alleges that JLSG and JLIP are the alter egos of Mr. Gerszberg personally, such that if personal jurisdiction is proper over Mr. Gerszberg (as shown above), it is also proper over his alter ego companies.  (*Id*. at ¶ 75.) Specifically, the Complaint alleges that Mr. Gerszberg did not maintain proper divisions among his companies, failed to keep proper books, disregarded the corporate form that was laid out in the JVA, and generally used the entities to advance various frauds, including the commandeering of JLIP to file a patent lawsuit without the permission of Mr. Li.  (*Id*. at ¶¶ 23-24, 27, 67, 71-75.)

With respect to the alternative theory of successor liability, it is well-recognized that a corporate successor "inherits" personal jurisdiction from its predecessor with respect to claims against the predecessor.  As explained by the court in *CenterPoint Energy, Inc. v. Superior Court*, 157 Cal. App. 4th 1101, 1120 (2007), "[i]n a case raising liability issues, a California court will have personal jurisdiction over a successor company if (1) the court would have had personal jurisdiction over the predecessor, and (2) the successor company effectively assumed the subject liabilities of the predecessor."

To establish successor liability in California, it is sufficient for plaintiff to show any one of the following: (1) the successor expressly or impliedly agrees to assume the subject liabilities, (2) the transaction amounts to a consolidation or merger of the successor and the predecessor, (3) the successor is a mere continuation of the predecessor, or (4) the transfer of assets to the successor is for the fraudulent purpose of escaping liability for the predecessor's debts.  *Id*.   Here, Plaintiffs have focused principally on the fourth prong of fraud.  Specifically, Plaintiffs allege in their Complaint that if Jetlev cannot account for its debts such that it effectively ceases to exist, JLIP and JLSG should be deemed to have successor liability because they unfairly retained assets that should have properly belonged to Jetlev and that should have been used to satisfy Jetlev's debts.  (Complaint ¶¶ 23-24, 27, 67, 71-75.)  As alleged in the Complaint, assets flowed freely among these companies (who have the same employees – essentially just

17

Mr. Gerszberg) without any proper bookkeeping or compliance with the JVA, and Jetlev was allowed to collapse while funds that should have supported it were diverted for the benefit of the other entities.  (*Id*.)  This adequately states a claim for successor liability to support personal jurisdiction over JLIP and JLSG.

### C.    Transfer To Florida Is Not "In The Interests Of Justice"

Defendants argue in the alternative that this case should be transferred to Florida "in the interests of justice" pursuant to 28 U.S.C. §1631, which concerns transfer to another district court upon dismissal.  (Motion at 16.)  However, as shown below, this is a California-based dispute about injuries to California business operations, and no judicial efficiencies are created by transferring the case to a different Federal District Court in Florida when the other claimants' causes of action concern different injuries and are pending in State – not Federal – court.

### 1.    This Is A California Case About California Injuries

As discussed above, the allegations of the Complaint, in conjunction with the facts established in the O'Malley Declaration, show that Defendants had a long-standing relationship with Jetpack Enterprises by which they sought to take advantage of the Southern California market.  Jetpack Enterprises was paid commissions by Jetlev to promote the sale of Jetlev products.  Jetlev licensed Jetpack Enterprises its trademarks (indeed, Jetpack Enterprises was called "Jetlev Southwest" for a time).  Jetlev collected $85,000 from Jetpack Enterprises in exchange for a contemplated exclusivity in the San Diego region and continued sales of Jetlev jetpacks to San Diego.  Jetlev even had a VP of Marketing who sought to have Hollywood celebrities ride Jetlev's jetpacks at Jetpack Enterprises in Newport Beach.   Finally – and most importantly – Jetlev contracted to deliver over $100,000 of equipment to California before reneging on the deal and keeping Plaintiffs' money, knowingly injuring Plaintiffs in California.  The Complaint alleges that Messrs. Gerszberg and Rosenblatt participated in these acts directly such that they have both individual liability and alter ego liability, and that JLIP and JLSG have both alter ego and successor liability for Jetlev's conduct.  Given that JLIP and JLSG are

effectively synonymous with Mr. Gerszberg personally (who is alleged to be an alter ego of both) there is nothing unfair in calling each of these entities to California to respond to the Complaint.

### 2.    JLIP, JLSG And Mr. Gerszberg Are Not Even Florida Entities

Although the Motion states that JLIP is a "Florida LLC" (Motion at 15), the reality is that JLIP is a *Delaware* LLC that *forfeited its license to do business in Florida in 2015*.[11]  Similarly, JLSG is a Delware/New Jersey entity.  (Dkt. 21-1 ¶ 7.)  Neither JLIP nor JLSG has any offices or property in Florida – indeed, these are "paper-only" entities whose location is most appropriately tied to their manager, Mr. Gerszberg.  Mr. Gerszberg is a New Jersey resident (Motion at 15), and ran Jetlev remotely from his place of business in New York City (Complaint ¶¶ 19, 20, 35).  JLIP, JLSG and Mr. Gerszberg thus cannot claim any special ties to Florida, and could just as easily be involved in a litigation in California.  Mr. Rosenblatt claims to reside in Florida, however he was also found to own an apartment in a doorman-building in Manhattan, which is where he was served with the Complaint.  (*See* service affidavits at Dkts. 13 and 16.)

### 3.    Plaintiffs' Claims Are Different From Those Of The Other Claimants

While it is true that several other parties filed claims against Defendants in Florida State Court, the injuries to those claimants are distinct from the injuries to the Plaintiffs in this action.  This case principally concerns the November 2013 Contract, which was unique to Plaintiffs, and follows from a long-standing, California-centric relationship that defendant Jetlev had with plaintiff Jetpack Enterprises.  The claims of the Florida State Court claimants, by contrast, arise from unfulfilled purchase orders and breaches of warranty.  (*See* Dkt. 21-1, Ex. B.)  These have nothing to do with Plaintiffs November 2013 Contract.  Furthermore, the Florida State Court claimants had less contact with

---

[11] This information is publicly available for free on the Florida Secretary of State website: http://search.sunbiz.org/Inquiry/CorporationSearch/ByName.

4810-6094-8015.2

Defendants and are more properly characterized as "ordinary customers." Plaintiffs in this case had a much more substantive history and relationship with Defendants that makes jurisdiction in California proper. Perhaps most importantly, a ruling that the November 2013 Contract was breached, and/or that Defendants committed torts against Plaintiffs, would not preempt any separate ruling by the Florida State Court with respect to the Florida plaintiffs' claims that their purchase orders were unfulfilled or that their warranties were breached.

### 4.    Transfer Would Not Create Any Judicial Efficiency

Plaintiffs properly seek to avail themselves of diversity jurisdiction in federal court. Thus, if this case were transferred to Florida, it would go to the Federal District Court for the Southern District of Florida. The other Florida case, however, is in *State Court*, and thus would be running on a separate track regardless. The parties would be in the same position as they are right now: one case in Federal Court with the other proceeding separately in State Court. Thus, no judicial efficiency is gained by transfer.

### 5.    All Factors Weigh Against Transfer

Defendants notably fail to make any motion under 28 U.S.C. §1404(a) for change of venue. But even if Defendants had made a §1404(a) motion, transfer would still be unwarranted. The typical factors that courts would look to are "(1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, [] (8) the ease of access to sources of proof, [and (9)] in addition to the relevant public policy of the forum state." *Conger v. Scolari's of Cal., Inc.*, No. 14-1211, 2014 U.S. Dist. LEXIS 161608, *8-9 (C.D. Cal. Nov. 12, 2014).

With respect to Factor (1) – location of the contract – the November 2013 Contract was negotiated with Mr. O'Malley while he was in California, and concerned the delivery

20

of goods to California to erase a debt that was owed in California. Mr. O'Malley travelled to Jetlev to have Mr. Rosenblatt sign the contract in person, but could just as easily have obtained the signature remotely. Plaintiffs' choice of forum should not be undermined because Mr. O'Malley gave Mr. Rosenblatt the courtesy of a face-to-face visit. Indeed, such a policy would discourage face-to-face business meetings.

With respect to Factor (2) – applicable law – the November 2013 contract contained no choice of law provision. However, because the November 2013 Contract concerned a sale of goods to California for the purpose of erasing a debt owed in California, and because the alleged torts caused injury in California, the State of California has a significant interest in applying its law to adjudicate the case. *See Darulis v. Garate*, 401 F.3d 1060, 1062 (9th Cir. 2005) (courts apply a "governmental interest test" to determine which state law to apply in diversity case).

With respect to Factor (3) – plaintiffs' choice of forum – Plaintiffs appropriately chose to file their case in this Court, which is within ten miles of their Newport Beach headquarters. This is the District where the alleged misconduct was directed, and where the injuries flowing therefrom were felt.

With respect to Factors (4) and (5), Defendants' contacts with California have been discussed at length above, and indeed the alleged injuries arise directly from those contacts.

With respect to Factor (6), the parties' combined costs of litigating in California will not be different from their combined costs of litigating in the Southern District of Florida. Both federal courts apply substantially the same rules. Similarly, with respect to Factor (7), Plaintiffs perceive no difference in being able to compel third party witnesses to appear in California versus Florida. For example, Raymond Li is a primary third party witness, but he is located in Canada, so it is no easier to compel him to appear in one forum versus the other.

With respect to Factor (8) – ease of access to evidence – this factor is of diminished importance in the age of electronic records and discovery. *Consumer Fin.*

21

4810-6094-8015.2

*Prot. Bureau v. Nationwide Biweekly Admin., In*c., No. 15-2106, 2015 U.S. Dist. LEXIS 95004, *16 (N.D. Cal. July 21, 2015).   In any event, just as Jetlev can claim to have records in Florida, Plaintiffs can point out that all their records are in California, making it completely proper to adjudicate the case here.   With respect to witness availability and resources, Plaintiffs are located in Southern California, and Mr. O'Malley in particular is located in Newport Beach.   Plaintiffs are not large companies, and in comparison to Defendants, it would work a financial hardship on them to travel to a trial in Florida. (O'Malley Dec. ¶ 20.)   Mr. Gerszberg, on the other hand, is a wealthy businessman from New York, who can just as easily travel to California as he can to Florida should there be a trial.   Mr. Rosenblatt also appears to have ample resources, given than he can afford to have dual residence in both Florida and Manhattan.   (Dkts. 13 and 16.)   He could undoubtedly travel just as easily to California as he could between his two residences in New York and Florida.   In sum, the relative ease of access to evidence and burden on the parties favors keeping this case in California.

With respect to the final Factor (9) – public policy of the forum State – it is unquestionable that the State of California has a strong interest in adjudicating this case. Plaintiffs are California companies headquartered only ten miles from this courthouse who have built up an important new watersports business in Newport Beach and San Diego.   California has a strong interest in protecting its innovators and entrepreneurs from out-of-state entities that defraud them and cause injury to their California-based businesses, where that injury negatively impacts local California commerce.   In sum, this is a California case that should properly remain in California.

## V.   **CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request that Defendants' Motion be denied.

22

4810-6094-8015.2

Dated:  April 4, 2016

**FOLEY & LARDNER LLP**

By:  */s/ Jean-Paul Ciardullo*
   Jean-Paul Ciardullo

Attorneys for Plaintiffs
Jetpack Enterprises, LCC and
Jetpack Enterprises – San Diego, LLC

23

4810-6094-8015.2