**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **JETPACK ENTERPRISES, LLC, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**JETLEV, LLC, et al.,**<br><br>**Defendants.** | **Case No.: SACV 15-02113-CJC(JCGx)**<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** |

## I. INTRODUCTION

Plaintiffs Jetpack Enterprises, LLC and Jetpack Enterprises–San Diego, LLC (together, for simplicity, "Jetpack") bring this action against Jetlev, LLC ("Jetlev"); Jetlev Technologies, Inc. ("JTI"); JLIP, LLC ("JLIP"); JLSG, LLC ("JLSG"); Aquaflier,

LLC ("Aquaflier"); Seth Gerszberg; and Matthew Rosenblatt for breach of contract, fraud, promissory fraud, negligent misrepresentation, intentional interference with prospective economic advantage, conversion, negligence, fraudulent conveyance, and breach of fiduciary duty. (Dkt. 1.) Jetlev, JLIP, JLSG, Mr. Gerszberg, and Mr. Rosenblatt (the "Moving Defendants") have moved to dismiss the case for lack of personal jurisdiction, or in the alternative, to enforce a forum-selection clause. (Dkt. 21.) For the following reasons, that motion is DENIED.[1]

## II. BACKGROUND

### A. Parties

Jetpack is a California company engaged in the business of renting and selling recreational water jetpack equipment. (Dkt. 1 ["Compl."] ¶¶ 4–5; 13.) The water jetpacks that Jetpack rents enable users to "fly" over a body of water by employing a floating pump that forces water up a hose to an apparatus worn by a user that expels the water at high velocity, generating lift. (*Id.* ¶ 13.)

Defendant JTI is a company founded in 2007 which apparently pioneered the design and use of consumer-oriented jetpacks. (Compl. ¶¶ 15.) JTI designed a jetpack unit, secured patents on the design, and created units in-house to sell to business partners. (*Id.* ¶¶ 16–17.) In 2011, the founder of Jetlev—a Mr. Raymond Li—was in financial distress. (*Id.* ¶ 19.) Li entered into a loan agreement with Defendant Seth Gerszberg, who agreed to provide funding to JTI and Li in exchange for a share of control of JTI. (*Id.* ¶ 22.) In November and December 2011, Gerszberg formed three entities: JLSG,

[1] Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the hearing set for April 25, 2016 at 1:30 p.m. is hereby vacated and off calendar.

JLIP, and Jetlev.[2] (*Id.* ¶ 23.) Jetlev was apparently designed to replace JTI, and JLIP would be the intellectual property holding company for Jetlev. (*Id.*) Gerszberg and Li shared ownership of Jetlev. (*Id.*) Gerszberg allegedly used JLSG to provide his own personal funding to Jetlev. (*Id.* ¶ 24.)

On January 1, 2012, Gerszberg and Li executed a "Joint Venture Agreement," under which JTI transferred all of its assets to Jetlev and Jetlev assumed effectively all of JTI's debts and obligations. (Compl. ¶ 26.) The Joint Venture Agreement obligated Gerszberg to provide sufficient funding to Jetlev to keep it in business and meet customer orders. (*Id.*)

According to the Complaint, Gerszberg began using money from Jetlev's customers for improper purposes. For example, he is alleged to have used a deposit from a Jetlev customer to repay a loan from a close friend, Defendant Matthew Rosenblatt. (Compl. ¶ 44.) In 2013, Gerszberg installed Rosenblatt as the new CEO of Jetlev. (*Id.* ¶ 53.) Rosenblatt allegedly began telling customers that Jetlev had entered or was about to enter bankruptcy, which was untrue. (*Id.* ¶¶ 55–56.) In March 2014, Gerszberg and Rosenblatt founded a new company, Defendant Aquaflier, LLC. (*Id.* ¶ 58.) The Complaint alleges that Aquaflier essentially appropriated Jetlev by setting up shop in Jetlev's headquarters and absorbing some of Jetlev's assets. (*Id.* ¶¶ 58–59.) The particulars of this arrangement are unclear, although the Complaint alleges that the two companies have engaged in an "unlawful transfer of assets" and that a "revenue-sharing agreement exists" between them. (*Id.* ¶ 59.) Jetpack alleges that Gerszberg and Rosenblatt have "hidden behind the corporate veil of Jetlev" and that Jetlev is merely an alter ego of those two individuals. (*Id.* ¶ 65.)

---

[2] The Complaint posits that JLSG and JLIP stand for "Jetlev Seth Gerszberg" and "Jetlev Intellectual Property," respectively. (Compl. ¶ 23.)

**B. Factual Allegations Giving Rise to the Complaint**

In early 2011, John Morris—Jetpack's founder—purchased several jetpack units from Mr. Li, who was then operating JTI (prior to Mr. Gerszberg and Mr. Rosenblatt's involvement). (Compl. ¶ 76.) Morris subsequently founded Jetpack and began operating under the trade name "Jetlev Southwest," although there was no formal operating agreement between Jetpack and JTI. (*Id.*)[3] Jetpack owned its jetpacks outright, ran a successful rental operation, and was promised that it would receive a 15% commission from JTI on jetpack sales that it arranged. (*Id.* ¶ 77.) Jetpack continued to expand its operations and, in February 2013, it executed a contract under which it agreed to pay Jetlev—which had by that point replaced JTI—a fully refundable $85,000 deposit toward the possible future purchase of four new jetpacks. (*Id.* ¶ 82.) In exchange, Jetlev was to provide exclusivity in the San Diego region. (*Id.*) The parties refer to this agreement, which was memorialized in February 2013, as the "San Diego Agreement."

Around the same time, it became apparent to Jetpack that Jetlev was failing to deliver promised equipment or meet other financial obligations. (Compl. ¶ 85.) Jetlev was late to fulfill a Singapore order which Jetpack had arranged (and which Jetpack alleges it was due a $18,000 commission for, which was never paid). (*Id.*) Jetlev also failed to fulfill a $2,415 order Jetpack had made for helmets, failed to repair broken equipment, and was "unresponsive" to inquiries from Jetpack. (*Id.*) In August 2013, Jetpack demanded its $85,000 deposit back and requested payment of the $18,000 Singapore commission and a refund of the $2,415 from the unfulfilled helmet order, as well. (*Id.* ¶ 87.) Rosenblatt led Jetpack personnel to believe that it was facing a "short term cash crunch" and that the best course of action would be to credit the money that Jetlev owed to Jetpack toward the purchase of new jetpack equipment. (*Id.* ¶ 88.) Dean

[3] Mr. Li apparently conceptualized some of his early business partners—i.e, entities that would purchase his jetpacks and then rent them to consumers—as "dealerships." (*See, e.g.*, Compl. ¶ 15.)

O'Malley, Jetpack's president, agreed and drew up a contract ("the Contract"), which O'Malley and Rosenblatt signed. (*Id.* ¶ 89.) Under the terms of the Contract, Jetlev acknowledged a $105,422.80 debt to Jetpack. (*See* Compl. Exh. 3.) Jetpack agreed that the debt would be "zeroed out" by certain unpaid invoices plus the delivery of fourteen new jetpack units (called "AquaFlyer" or "AquaBoard" units). (*Id.*) Rosenblatt and O'Malley signed the agreement on November 7, 2013. (*Id.*) Jetpack alleges that Jetlev never delivered the new units or returned any of the money. (Compl. ¶ 90.)

In April 2014, O'Malley traveled to Jetlev's headquarters in Florida to check on the status of the promised units. (Compl. ¶ 92.) Rosenblatt told O'Malley that he was in the process of bankrupting Jetlev and was planning to launch a new jetpack company. (*Id.*) Rosenblatt offered to sell O'Malley new units from his new company for a price similar to that negotiated in the Contract. (*Id.*)

Based on Rosenblatt's assertion that Jetlev was bankrupt, Jetpack cut ties with Jetlev and assumed that its money had been lost. (Compl. ¶ 93.) Jetpack asserts that it was forced to return deposits from customers who had ordered the units Jetlev was supposed to deliver, and that Jetpack's reputation was damaged from the ordeal. (*Id.*) According to the Complaint, Jetlev never actually went bankrupt, and Jetpack would now like its money back.

**C. Procedural Background**

Jetpack filed its complaint against Defendants on December 18, 2015. The Complaint asserts nine causes of action against the Defendants: for (1) breach of contract, (2) fraud, (3) promissory fraud, (4) negligent misrepresentation, (5) intentional interference with prospective economic advantage, (6) conversion, (7) negligence, (8) fraudulent conveyance, and (9) breach of fiduciary duty. (*See generally* Compl.)

Essentially, Jetpack alleges that Jetlev failed to perform on its obligations in the Contract and then misled Jetpack to believe first that it could still meet those obligations, and second that it was in bankruptcy, all in an effort to persuade Jetpack to drop its claim for the roughly $105,000. (*See id.*) On April 25, 2016, Jetlev, JLIP, JLSG, Gerszberg, and Rosenblatt (the "Moving Defendants") all moved to dismiss the Complaint for lack of personal jurisdiction over them. (*See* Dkt. 21.) Jetpack filed opposition papers, the Moving Defendants replied, and Jetpack filed an ex parte application for leave to file a sur-reply. As consideration of Jetpack's proposed sur-reply would have no effect on the Court's disposition of this motion, Jetpack's ex parte application, (Dkt. 29), is DENIED.

## III. LEGAL STANDARD

A party may move to dismiss an action for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). Federal courts may only decide cases over which they have both statutory and constitutional jurisdiction. *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002). Where, as here, there is no applicable federal statue governing personal jurisdiction, the district court applies the law of the state in which the court sits. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006). Because California's long-arm statute, California Civil Procedure Code section 410.10, extends jurisdiction to the limit of federal due process, the Court need only analyze the constitutional question. *See id.*; *Glencore*, 284 F.3d at 1123.

Constitutional due process concerns are satisfied when a nonresident defendant has "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Doe v. Unocal Corp.*, 248 F.3d 915, 923 (9th Cir. 2001) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Under the minimum contacts analysis, jurisdiction may be general or

specific. *Id.* It is the plaintiff's burden to establish the court's personal jurisdiction over a defendant. *Id.* at 922. When a district court acts on a defendant's motion to dismiss without an evidentiary hearing, the plaintiff need only demonstrate facts that, if true, would support jurisdiction over the defendant. *Id.* Thus, the court may consider evidence presented in affidavits to assist it in its determination, but any factual disputes are resolved in plaintiff's favor. *Id.* When the plaintiff's version of the facts is not directly controverted, it is taken as true for the purposes of a Rule 12(b)(2) motion. *Id.* However, "we may not assume the truth of allegations in a pleading which are contradicted by affidavit." *Data Disc, Inc. v. Sys. Tech. Assoc., Inc.*, 557 F.2d 1280, 1284 (9th Cir. 1977).

## IV. ANALYSIS

The parties agree that only specific jurisdiction is at issue here. In the Ninth Circuit, courts "employ a three-part test to assess whether a defendant has sufficient contacts with the forum state to be subject to specific personal jurisdiction." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). The parts are:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Id.* The plaintiff has the burden of proving the first two prongs. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011). If a plaintiff is able to successfully do so, "the burden shifts to the defendant to set forth a compelling case that the exercise of jurisdiction would not be reasonable." *Picot*, 780 F.3d at 1212.

The exact form of the personal jurisdiction inquiry depends on the nature of the claims at issue. For claims sounding in contract, courts "generally apply a 'purposeful availment' analysis and ask whether a defendant has 'purposefully avail[ed] [himself] of the privilege of conducting activities within a forum State, thus invoking the benefits and protections of its laws." *Picot*, 780 F.3d at 1212 (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)). For claims sounding in tort, by contrast, courts apply a "purposeful direction" test and examine whether the defendant "has directed his actions at the forum state, even if those actions took place elsewhere." *Id.* at 1212.

**A. Jetlev**

**1. Contract Claims**

Jetpack argues that Jetlev is subject to personal jurisdiction in this Court because the 2013 Contract "contemplates the sale and delivery of over $100,000 worth of equipment into California for the purpose of simultaneously erasing a debt owed in California and perpetuating what had been an ongoing relationship between Jetlev and Jetpack . . . to exploit the California market." (Dkt. 25 at 11.) Additionally, Jetpack argues, the 2013 Contract itself arose out of the San Diego Agreement, which specifically

concerned Jetpack and Jetlev's rights and responsibilities regarding expansion in California.

The two contracts support this line of argument. The underlying San Diego Agreement, for example, explicitly provided that Jetpack would "transfer two of its . . . [j]etpack units permanently to a rental center in San Diego," that it would "maintain th[o]se first two units in San Diego," and that it would pay Jetlev a $21,250 deposit for each of the four anticipated units. (Dkt. 25-2 at 1.) In exchange, Jetlev agreed that it would "not enter into [an agreement] with any third-party for operation of a [j]etpack rental facility in San Diego." (*Id.* at 2.) Although "a contract alone does not automatically establish minimum contacts in the plaintiff's home forum," *Boschetto v. Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008), jurisdiction is appropriate "where a defendant 'deliberately has engaged in significant activities within a State, or has created 'continuing obligations' between himself and residents of the forum," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985). The San Diego Agreement created California-related obligations for both parties: Jetpack would establish a rental operation in San Diego with a sufficient number of jetpacks, and Jetlev would grant Jetpack two years' worth of exclusivity in that area. The San Diego Agreement even contained a map identifying what areas counted as "San Diego" for the purposes of that agreement. (*See* Dkt. 25-2 at 2.) While perhaps not determinative, surely the fact that a relevant contractual agreement *contains a map of California* suggests that a party is not being haled based on "random, fortuitous, or attenuated contacts" with California, *Burger King*, 471 U.S. at 475.

//

//

//

//

Jetlev's response is that Jetpack is alleging a breach of the Contract, not the San Diego Agreement.[4] (*See* Dkt. 27 at 7–8.) But the Contract, too, concerns California-centric obligations. It describes a "running balance" between Jetlev and Jetpack—i.e., a debt owed to Jetpack in California—that consisted of, among other things, "refundable exclusivity deposits from the San Diego territory." (Dkt. 1-3 at 1.) The Contract provided that those obligations would be "zeroed out"—or, in other words, that Jetlev would be released from its (California-related) obligations under the San Diego Agreement provided that it met its obligations under the Contract. It is difficult to read these agreements, as Jetlev does, to describe only incidental contacts with California. On the contrary, Jetlev's commercial interactions with Jetpack specifically contemplated the use of Jetlev's products in California, by a California company, at the cost of selling to other California consumers. *See Burger King*, 471 U.S. at 479 (identifying "prior negotiations," "contemplated future consequences," "the terms of the contract," and "the parties' actual course of dealing" as factors to consider when evaluating personal jurisdiction).

In short, Jetlev entered into one contract with Jetpack which obligated it to sell products to Jetpack, a California company, and to refrain from doing business with other companies within a certain, intra-California geographic area. It then entered into a separate contract with Jetpack releasing it from those obligations in exchange for providing Jetpack with separate goods. Those contracts created ties between Jetlev and California that were independent of Jetpack's ties to California. Accordingly, the Court finds that those contracts evince purposeful availment of California on Jetlev's part. Additionally, the Court finds that Jetpack's breach of contract claim against Jetlev arises out of Jetlev's forum-related activities. It is therefore "presumptively not unreasonable"

[4] Separately, Jetlev argues that the San Diego Agreement is "for the discrete provision of goods." (Dkt. 27 at 8.) This argument is contrary to the explicit language of the agreement, which provides for a two-year period of exclusivity.

to subject Jetlev to jurisdiction here in California, *Burger King*, 471 U.S. at 476, and the burden shifts to Jetlev to demonstrate that jurisdiction would not "comport with fair play and substantial justice," *Picot*, 780 F.3d at 1211. It has failed to do so. Jetlev asserts that it and the other Moving Defendants are currently defending two separate lawsuits brought by Jetpack in Florida state court, and that those actions will involve "substantially the same witnesses and evidence" as this case. (Dkt. 21 at 15.) But that alone is not a reason to conclude that it would be unfair for Jetlev to defend itself here in California, where it did business with Jetpack and agreed *not* to do business with others. As Jetpack points out, litigation in California is more convenient for it—a California company—and sending this lawsuit to *federal* court in Florida will not save the parties much trouble, since the other two cases are proceeding in Florida *state* court. The Court agrees, and concludes that a finding of personal jurisdiction over Jetlev comports with fair play and substantial justice.

**2. Remaining Claims**

Jetpack's remaining claims against Jetlev derive from tort law. When evaluating whether a court has specific personal jurisdiction over a tort claim, courts in the Ninth Circuit apply a three-part "effects" test deriving from *Calder v. Jones*, 465 U.S. 783 (1984), which asks whether a defendant has "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the form state." *Schwarzenegger*, 374 F.3d at 803. Were it to apply this analysis, the Court would conclude that Jetpack has alleged tortious conduct that is adequately directed at California. But there is no need to engage in significant analysis on this point because the Ninth Circuit has adopted the doctrine of "pendent personal jurisdiction," which holds that "a court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in

the same suit over which the court does have personal jurisdiction." *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004). Here, *all* of Jetpack's claims arise from one common nucleus of operative fact: namely, Jetlev's alleged failure to fulfill contractual obligations and allegedly misleading statements regarding its financial stability and impending bankruptcy. Pendent personal jurisdiction is therefore appropriate over the remainder of Jetpack's claims against Jetlev.

**B. Gerszberg, Rosenblatt, JLIP, and JLSG**

Jetpack argues that this Court has personal jurisdiction over Gerszberg, Rosenblatt, JLIP, and JLSG because they are all merely alter egos of each other. "Where a corporation is the *alter ego* of the stockholders so as to justify disregard of the corporate entity, jurisdiction over the corporation will support jurisdiction over the stockholders." *Flynt Dist. Co. v. Harvey*, 734 F.2d 1389, 1393 (9th Cir. 1984). In such a situation, a plaintiff is required to make only a "prima facie showing of jurisdiction," or "(1) that there is such unity of interest and ownership that the separate personalities of the corporation and the individuals no longer exist and (2) that the failure to disregard the corporation would result in fraud or injustice." *Id.*

Here, the Complaint makes detailed allegations regarding the relationships between Jetlev, Rosenblatt, Gerszberg, JLIP, and JLSG. For example, Jetpack accuses Gerszberg and Rosenblatt of, among other things, "co-mingling personal assets with the company's assets," "withdrawing capital from Jetlev to repay personal debts," "failing to keep proper corporate records in a deliberate effort to cover up transactions," "unlawfully shifting assets out of Jetlev to other companies," "fail[ing] to hold board meetings of all the managers," "improperly using JTI's accounts to prevent having a clear record of Jetlev's transactions," "deliberately under-capitalizing Jetlev in the face of pre-existing contractual obligations to business partners and customers," and "diverting Jetlev assets

to pay excessive amounts of money to Mr. Gerszberg's personal associates." (Compl. ¶ 19.) Jetlev also alleges that JLIP and JLSG have the "same employees and managers as Jetlev[] and have failed to observe proper corporate formalities in isolating their businesses from Jetlev, or properly disposing of Jetlev's outstanding obligations to creditors." (*Id.* ¶ 74.) Additionally, the Complaint points to other facts—including the physical addresses of Gerszberg and Rosenblatt's companies, the similarities of certain forms, the fact that multiple companies retained Gerszberg's lawyer, and the fact that Rosenblatt told Jetpack that he and Gerszberg were "one [and] the same"—that give rise at least to significant questions regarding whether Gerszberg and Rosenblatt's actions were entirely above-board. (*See id.* ¶¶ 53–59.)

Not all of these allegations are supported by extensive documentary evidence. But, crucially, the Moving Defendants make virtually no effort to dispute them. They allege that Jetpack's alter ego allegations are "demonstrably false," (Dkt. 21 at 15), but they do not actually demonstrate *how* they are false. Both Mr. Gerszberg and Mr. Rosenblatt submitted declarations in support of their motion, but neither declaration avers that any of their entities are properly separated from one another, nor that Gerszberg and Rosenblatt maintained appropriate financial records or held appropriate board meetings. Nor does Mr. Gerszberg dispute that he co-mingled personal funds with business funds or used business funds to repay personal loans. Indeed, there is *no* evidence currently in the record disputing Jetpack's alter ego allegations. *Cf. Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1298 (S.D. Cal. 2003) (finding no jurisdiction based on alter ego allegations when a defendant "offer[ed] proof that . . . [the relevant entities] ke[pt] separate books and records and separate bank accounts, as well as being responsible for [their] own day-to-day operations"). Accordingly, Jetpack has made out a prima facie case of alter-ego liability for the purposes of evaluating personal jurisdiction, and this Court has jurisdiction over Mr. Gerszberg, Mr. Rosenblatt, JLIP, and JLSG. *See Johnson v. Serenity Transp., Inc.*, No. 15-cv-02004-JSC, 2015 WL 6664834, at *5 (N.D. Cal.

Nov. 2, 2015) (denying motion to dismiss alter-ego allegations where plaintiff had alleged inadequate capitalization, failure to maintain proper minutes and records, sole ownership of all stock, and failure to conduct board meetings).[5]

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that it has personal jurisdiction over each of the Moving Defendants and that JLIP's forum-selection clause has no effect in this matter. Accordingly, the Moving Defendants' motion to dismiss is DENIED.

DATED: April 19, 2016

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

---

[5] JLIP also argues that this action should be dismissed pursuant to a forum-selection clause in a 2013 "Rental Operating Agreement" between it and Jetpack. That agreement does contain a forum-selection clause, but that clause provides that only "action[s] between [JLIP and Jetpack] arising out of and/or relating to this Agreement shall be brought exclusively in [Florida state court]." (Dkt. 21-1 Exh. A at 13.) The Rental Operating Agreement covered such matters as licensing, (*id.* at 7–8), marketing, (*id.*), operations, (*id.*), inspections, (*id.* at 9–10), intellectual property, (*id.* at 10), reporting, (*id.*), referral fees, (*id.* at 11), indemnifications, (*id.* at 12), limitation of liability, (*id.*), and assignment, (*id.* at 13). It did *not* cover any of the subject matter of the San Diego Agreement—equipment purchase or geographic exclusivity—or the subject matter of the 2013 Contract—a renegotiation of debts and additional equipment purchasing. Those agreements, and not the Rental Operating Agreement, form the basis of this action, and neither of them contains a forum-selection clause. None of Jetpack's claims can reasonably be said to arise out of or relate to the Rental Operating Agreement, which was only executed by JLIP—and no other Defendant—in the first place. Accordingly, that agreement's forum-selection clause has no effect in this action. Perhaps realizing these difficulties, JLIP failed to discuss its forum-selection argument at all in its reply brief, (Dkt. 27).